CENTRAL MONSERRATE, INC., ET AL., peticionarios, *v.* JUNTA AZUCARERA DE PUERTO RICO, demandada.

Número 17.
*Sometido:* 4 de junio de 1961. *Resuelto:* 27 de junio de 1961.

110

*R. Rivera Zayas, G. Rivera Cestero, Milton F. Rúa* y *A. Segurola de Diego,* abogados de los peticionarios; *Alejandro Romanace,* abogado de la demandada.

EL JUEZ ASOCIADO SEÑOR SERRANO GEYLS emitió la opinión del Tribunal.

Este recurso plantea varias cuestiones importantes en la administración de la Ley Azucarera de Puerto Rico (Leyes de 1951, pág. 1139) particularmente de su art. 8 (5 L.P.R.A. sec. 377). La peticionaria Central Monserrate, Inc. sometió a la Junta Azucarera un informe de sus gastos de embarque y mercadeo relativos a la zafra de 1953. Luego de varios trámites que luego detallaremos, la Junta finalmente rechazó algunas de las partidas. A solicitud de los peticionarios expedimos un auto de revisión. Más tarde suspendimos la orden de la Junta, luego de habérsenos sometido la fianza correspondiente.

Los arts. 7 y 8 de la Ley Azucarera proveen lo siguiente:

"Artículo 7.—Las liquidaciones provisionales del azúcar correspondiente a los colonos se librarán por la central quincenal o mensualmente, según lo determine la Junta, o en su defecto, por el período de liquidación usado durante el año inmediatamente anterior, tomándose como valor del azúcar para su liquidación el precio promedio de los azúcares de Puerto Rico C.I.F. New York correspondiente a la quincena o mes en que se haya entregado la caña. De los precios promedios de azúcar de Puerto Rico de 96 grados de polarización en el mercado de Nueva York, determinados según arriba se prescribe, podrá la central descontar las cantidades que estime necesarias para cubrir gastos de embarque y mercadeo en todos los casos de colonos que no

optaren por recibir su participación en azúcar según se provee más adelante; *Disponiéndose,* que cuando el colono estime que la cantidad descontada por la central por dichos conceptos es excesiva, podrá solicitar de la Junta que fije la cantidad que deberá descontar la central provisionalmente para esos fines y la Junta queda facultada para así hacerlo; *Disponiéndose, además,* que la Junta podrá, previa audiencia de todas las partes interesadas, proveer otro sistema de liquidación que sea justo y razonable.

"Cuando el colono antes del 1ro. de diciembre anterior al comienzo de la zafra así se lo notificare a la central, ésta estará obligada a entregarle la totalidad del azúcar de 96 grados que le corresponda de acuerdo con esta Ley y los reglamentos promulgados bajo la misma.

"Los colonos que opten porque su participación en el producto de sus cañas le sea liquidada en azúcar, gozarán de derecho de almacenaje en los almacenes de la central hasta el día 31 de diciembre siguiente a la zafra durante la cual se produjeron dichos azúcares sin pago de cantidad alguna por el disfrute de dicho derecho.

"La central le garantizará a los colonos doscientas cincuenta (250) libras de azúcar a 96º por cada saco entregado a compradores hasta el día 31 de octubre siguiente a la zafra durante la cual se produjeron los azúcares del colono. Cualquier cantidad en dólares que resulte en exceso de la referida garantía por diferencia de peso o polarización, será para beneficio de la central. Cualquier cantidad en dólares en defecto de dicha garantía por diferencia de peso o polarización, será rembolsada por la central a los colonos. En ambos casos dichos pagos de reajuste se efectuarán en dinero y no en azúcar.

"La central entregará azúcares a los colonos en sacos nuevos de doscientos cincuenta (250) libras netas cada uno, y en caso de que la central se viere obligada a usar sacos viejos compensará a los colonos por la reducción en precio (*penalty*) impuesta a los azúcares como resultado del uso de dichos sacos viejos.

"Artículo 8.—Las liquidaciones finales de los gastos de embarque y mercadeo, se librarán después que la central haya vendido todos los azúcares y haya determinado los gastos por concepto de embarque y mercadeo realmente incurridos, los cuales deberán ser previamente aprobados por la Junta; *Disponiéndose,* que si la Junta o cualquier colono no estuviere conforme con la razonabilidad o corrección de dichos gastos, o estimare

que los mismos o alguna parte de ellos no son deducidos bajo los términos de esta Ley, la Junta, a petición del colono, o *motu proprio*, deberá señalar una vista donde las partes tendrán oportunidad de formular sus alegaciones y presentar prueba sobre los derechos que crean corresponderles, no pudiendo la central hacer la liquidación final hasta que la Junta resuelva la controversia."

Los peticionarios y los *amici curiae* nos someten cuestiones relativas al alcance de los poderes de la Junta, al procedimiento utilizado por ella, y al rechazo de varias partidas específicas. Consideraremos esas cuestiones separadamente.

## I

La Junta le rechazó a la peticionaria las partidas de estibado y cargado del azúcar en camiones en los almacenes arrendados y renta de los almacenes, y le redujo la de transportación de la factoría a los muelles, de la factoría a los almacenes arrendados y de éstos a los muelles. Consideró que las dos primeras partidas y la cantidad rebajada de la otra no eran gastos de "embarque y mercadeo". Se impugna el poder de la Junta para hacer tal determinación, aduciéndose que el art. 8 sólo le concede la facultad de rechazar los gastos si éstos no han sido "realmente incurridos" o si ella "no estuviere conforme con la razonabilidad o corrección de dichos gastos", pero que no puede rechazarlos porque a juicio de ella no sean de "embarque y mercadeo". No son válidos esos argumentos.

El art. 7 reglamenta las liquidaciones provisionales del azúcar que las centrales deben hacerles a sus colonos. De los precios promedios para el azúcar que la Ley fija, se autoriza a cada central "a descontar las cantidades que estime necesarias para cubrir gastos de embarque y mercadeo en todos los casos de colonos que no optaren por recibir su participación en azúcar..." Este no es, sin embargo, un poder absoluto de la central. Aun en este caso de liquidación "provisional", la ley sujeta al molino a dos intervenciones: 1. a solicitud del colono, cuando él estime que la cantidad es exce-

siva, la Junta está autorizada a fijar la cantidad que deberá descontar la central provisionalmente; y 2. la Junta podrá proveer "otro sistema de liquidación que sea justo y razonable", previa audiencia a los interesados.

El art. 8 establece el procedimiento para hacer las liquidaciones finales de los gastos de embarque y mercadeo. Requiere la aprobación previa por la Junta de gastos "realmente incurridos" y crea un procedimiento de impugnación de dichos gastos bajo criterios de razonabilidad, corrección y conformidad con la Ley. Nos parece claro que esos dos artículos conceden a la Junta amplios poderes de investigación y decisión en ánimo de proteger los intereses de los colonos, quienes por motivo de la estructuración económica de la industria tienen muy escasa, si alguna, participación en el proceso de venta del azúcar, y constituyen, además, un grupo económico débil. *Antonio Roig Sucrs., S. en C.* v. *Sugar Board of Puerto Rico*, 235 F.2d 347, 351–352 (1956); cert. denegado, 352 U.S. 928 (1956). No puede pensarse que un poder de esa índole no encierre en su perímetro la potestad elemental de desaprobar los gastos que realmente no sean de "embarque y mercadeo", y que la Junta esté obligada a aceptar bajo ese rubro después que haya sido realmente incurrida, cualquier expensa que la central reclame, como digamos, los gastos de representación del administrador, o la depreciación del automóvil que usa el ingeniero.

Las leyes anteriores a la de 1951 comprueban la preocupación legislativa sobre este asunto. Tanto en la ley de 1937 como en la de 1938 se fijó un tope para dichos gastos, que fue primero de quince centavos por quintal y luego de veinticinco.([1]) La Ley Núm. 221 de 12 de mayo de 1942 (Leyes, pág. 1177) delegó en la Comisión de Servicio Público la reglamentación de este y otros aspectos de la industria azucarera, y dicho organismo exigía que al terminar la venta y en-

([1]) Sección 11 de la Ley Núm. 112 de 13 de mayo de 1937 (Leyes, pág. 271) según enmendada por la Ley Núm. 213 de 15 de mayo de 1938 (Leyes, pág. 428).

trega de los azúcares, cada compañía azucarera le sometiera un estado detallado de dichos gastos "para aprobación de este organismo." La compañía debería informar el "costo total y real de dichos gastos" y el reglamento, además, prohibía descontarle al colono "una cantidad mayor que el promedio por quintal de azúcar en que por dichos conceptos incurriese la compañía azucarera a base de la cantidad total del azúcar que ésta hubiese vendido y exportado".(²)

La ausencia de definición del término "gastos de embarque y mercadeo" en la Ley Azucarera de 1951 y los poderes que se le otorgaron a la Junta, responden, sin duda, al deseo legislativo de delegar en ese organismo la razonable reglamentación del asunto y de confiar, por tanto, a la discreción administrativa determinaciones que requieren la diaria atención a diversos factores económicos y de organización industrial. Las normas que gobiernan esa delegación no violan mandato constitucional alguno. *Porto Rico Telephone Co.* v. *Tribunal de Contribuciones*, 81 D.P.R. 982, 1001–1002 (1960).

Nos parece irrebatible, a la luz de la letra y los propósitos de la Ley de 1951 y de sus precedentes legislativos, que los arts. 7 y 8 de la citada Ley conceden a la Junta Azucarera el poder de desaprobar partidas sometídales por las centrales como "gastos de embarque y mercadeo", cuando efectivamente no lo sean.

Nos dicen, sin embargo, los peticionarios que la Junta no puede desaprobar determinadas partidas de los gastos de embarque y mercadeo a menos que los colonos afectados las impugnen ante la Junta. La dificultad de aceptar el argumento radica en que la Ley dice lo contrario.

El art. 8 exige que las liquidaciones finales de los gastos de embarque y mercadeo deben ser "previamente" aprobadas por la Junta. A renglón seguido dice que "si la Junta o

---

(²) Examínese el art. 11, incisos (*g*), (*h*) e (*i*) del Reglamento General para las Compañías Azucareras, aprobado por la Comisión el 24 de julio de 1946.

cualquier colono no estuviere conforme" con ellas, "la Junta a petición del colono, o *motu proprio*" deberá señalar una vista para dilucidar la controversia. Es evidente que esta disposición concede a la Junta la facultad de iniciar y continuar hasta su terminación el procedimiento de revisión de las liquidaciones finales sometídales por la central, independientemente de que los colonos afectados le presenten o no quejas sobre el asunto. No hay, desde luego, nada novedoso o inusitado en ello. Por razones muy conocidas, la reglamentación oficial de actividades económicas y sociales hace tiempo se canaliza a través de organismos administrativos a los cuales se les conceden amplios poderes de investigación, reglamentación, y decisión de controversias particulares. Desde los primeros años surgió la necesidad de otorgar a estos organismos los poderes de entender en dichos procedimientos a iniciativa propia, porque la experiencia demostraba que los grupos en beneficio de los cuales se instituían esos programas, carecían de medios eficaces para hacer valer sus nuevos derechos y hubiese resultado ineficaz instituir los procedimientos adversativos ordinarios en tales casos. Tanto de la sec. 8 como de otras disposiciones de la Ley Azucarera se desprende con cegadora claridad que ese fue el plan seguido por el legislador al reglamentar la industria azucarera.

■ Se nos dice, además, que la actuación de la Junta es ilegal por ser retroactiva, aduciéndose que en el momento en que la central hizo los descuentos, no había reglamentación u orden de la Junta prohibiéndolos. Otra vez la Ley malogra el argumento. Es obvio que las facultades de la Junta de investigar los gastos de embarque y mercadeo y de resolver las controversias específicas nacidas de esas investigaciones, se originan en el art. 8 y no requieren para su validez legal de reglamentación administrativa alguna, aun cuando la Junta puede, desde luego, implantar aquella que haga el procedimiento más viable y preciso. Como en este caso se trata de gastos correspondientes a la zafra de 1953, y como la Ley

Azucarera entró en vigor el 13 de mayo de 1951, los peticionarios tenían completas noticias de que los antedichos gastos tendrían que someterse al escrutinio de la Junta para su aprobación final.

■■ La última alegación de los peticionarios en este aspecto del recurso sostiene que la actuación de la Junta es inconstitucional porque el pago retroactivo de sumas no reclamadas por los colonos les priva de su propiedad sin el debido procedimiento de ley y menoscaba las obligaciones contractuales. El primer alegado defecto constitucional no se elabora y en cuanto al segundo se nos dice que el menoscabo consiste en que los colonos al recibir los pagos de beneficios que distribuye el Departamento de Agricultura federal admitieron, al no quejarse, la corrección de los gastos de embarque y mercadeo hechos por la Central y, en su consecuencia, estaban concertando un contrato válido con ella en cuanto a los mencionados gastos. Aparte de que este argumento se presentó en la petición y luego no se discutió en los alegatos, por lo que debe entenderse que ha sido abandonado. *Junta de Relaciones del Trabajo* v. *Simmons International, Ltd.*, 78 D.P.R. 375, 384–385 (1955), es de su faz tan obviamente inmeritorio que no merece discutirse.

## II

■■ Los peticionarios, y principalmente los *amici curiæ*, impugnan el procedimiento que siguió la Junta en este caso. Alegan que se trata de un procedimiento cuasijudicial; que correspondía a la Junta como parte actora cargar con el peso de la prueba y demostrar, por tanto, que los gastos deducidos por la central no fueron realmente incurridos, o eran excesivos o eran innecesarios, y que la Junta no lo hizo; que la Junta "no apercibió a Monserrate dándole notificación de lo que se intentaba en su contra"; que de hecho "Monserrate nunca supo de qué se estaba defendiendo o venía obligada a defenderse"; y solicitan que este Tribunal trace claramente a la Junta el procedimiento que está obligada a seguir en cada

caso y "que se establezca de una vez y para siempre que la liberalidad y amplitud en los procedimientos administrativos no implica la anarquía ni el ejercicio de poderes omnímodos mediante los cuales el que juzga también investiga y condena de antemano". Veamos si la relación de lo sucedido en este caso sirve de apoyo a expresiones tan vehementes.

El 7 de junio de 1954 la Central sometió a la Junta su informe sobre gastos de embarque y mercadeo relativos a la zafra de 1953, y el día 1 de diciembre de 1954 la Junta le comunicó una orden rechazando ciertas partidas de conformidad con un informe detallado, que se acompañaba, preparado por el contador de la Junta y aprobado preliminarmente por ella. Dicho informe identificaba cabalmente las partidas rechazadas y el monto concedido por la Junta. La orden comunicó a la Central el propósito de la Junta de celebrar una vista el próximo día 8 de diciembre para oir las objeciones de la Central, si algunas. Parece que esa vista se suspendió. El 18 de diciembre Central Monserrate sometió a la Junta una "Oposición al Ajuste de Gastos de Embarque y Mercadeo" en la cual expresaba detalladamente sus objeciones a la orden de rechazo. Nada hay en ese escrito que implícita o expresamente indique que la peticionaria no estuviese cabalmente informada de la actuación administrativa. El 13 de enero de 1955 se celebró una vista que fue suspendida a solicitud de la Central, luego de haberse aceptado la participación en procedimientos de la Asociación de Productores de Azúcar en calidad de *amicus curiae*. El 15 de febrero siguiente, la peticionaria sometió a la Junta un escrito titulado "Fundamento Adicional como Oposición al Ajuste de Gastos de Embarque y Mercadeo". Tampoco se imputa en ese escrito el defecto de ausencia de notificación. El día siguiente se celebró la vista en su fondo y comparecieron la Central y la Asociación debidamente representadas. Declaró en esa vista el Administrador de la Central. Tampoco se planteó formalmente el defecto ya apuntado. Luego los comparecientes

sometieron escritos en apoyo de sus interpretaciones del art. 8.

El día 7 de abril la Junta dictó una larga Resolución, sub-titulada "Relación y Conclusiones de Hecho, Opinión y Or-den".(³) Contiene en detalle las partidas rechazadas y las razones en que se apoya el rechazo y ordena a la Central hacer los pagos correspondientes a los colonos.(⁴) El 11 de abril la Central sometió a la Junta una "Solicitud de Reconsideración" debidamente fundada pero tampoco alegó en ella falta de in-formación o deficiencia de prueba. Sus argumentos plantea-ban cuestiones de derecho idénticas a las consideradas ahora por el Tribunal, y que eran las mismas en las cuales la peti-cionaria había apoyado sus planteamientos desde el principio. Luego de varias suspensiones, la Junta reabrió el caso el día 1 de junio, suspendió su Resolución de 7 de abril y señaló el día 15 de junio para recibir información adicional en una vista. A ella asistieron varias centrales, entre las cuales estaba la peticionaria, y prestaron declaración dos testigos, uno de ellos un actuario. Al siguiente día dicho testigo so-metió un informe a la Junta sobre la partida de seguro ma-rítimo y ésta envió copias a todas las centrales afectadas, in-cluyendo a Monserrate. Esta y Central Juanita, Inc. se opu-sieron a que la Junta tomara en consideración dicho informe. La Junta desestimó esa objeción.(⁵) El 11 de octubre se cele-bró otra vista sobre los gastos de embarque y mercadeo y luego otras los días 14 y 25 de noviembre. En ellas declara-ron las personas que tuvieron a su cargo el examen de los informes de las centrales sobre dichos gastos y estuvieron sujetas a extensos interrogatorios y contrainterrogatorios. Finalmente, la Junta emitió una Resolución el 18 de enero de 1956 en la cual restauró su resolución anterior de 7 de abril de 1955, con varias modificaciones.

---

(³) En esta opinión se hace constar que fue el *amicus curiae* quien planteó la cuestión de procedimiento ante la Junta, aparentemente por medio de un informe que no consta en autos.

(⁴) Uno de los miembros de la Junta disintió.

(⁵) No se alega ante nos que esa actuación fuese errónea.

Difícilmente puede un organismo administrativo cumplir con mayor celo su deber de informar de sus actuaciones a las entidades y personas sujetas a sus órdenes, y darles una completa oportunidad de defensa. El expediente de este caso revela un cuidado verdaderamente extraordinario de parte de la Junta en estos extremos y, en su consecuencia, que la peticionaria estuvo totalmente informada de los dictámenes de la Junta y de las razones en que se apoyaban, y se le brindaron numerosas oportunidades de enfrentarse a la prueba de la Junta y de ofrecer la suya. Son, pues, absolutamente inmerecidas las imputaciones de anarquía, indefensión y parcialidad que los *amici curiae* nos han sometido contra la Junta.

Debemos corregir un error de perspectiva que surge del planteamiento de los *amici curiae*. En el caso presente hubo escasa disputa sobre las partidas desaprobadas por la Junta y sobre el monto de ellas. La controversia, prácticamente desde el principio, tuvo que ver sólo con el alcance de los poderes de la Junta, según los define el art. 8, y con la interpretación de la frase "gastos de embarque y mercadeo", de acuerdo como se utiliza en dicho artículo. Estas son admitidamente cuestiones de derecho. La Junta le dio a los participantes repetidas oportunidades de ilustrarla sobre esos asuntos, por medio de la argumentación oral y escrita y la presentación de testigos conocedores de la industria. Una vez permitidas esas expresiones, el organismo administrativo estaba libre para hacer las interpretaciones legales que creyere necesarias y convenientes, y para acudir a las fuentes, incluyendo su propia experiencia, que corrientemente se utilizan por los administradores y los jueces para iluminar la función interpretativa. "[E]s fundamental en derecho que no se requiere la presentación de prueba para que exista una 'vista adecuada', cuando dicha prueba no afecta la cuestión que va a ser resuelta. Si una cuestión de hecho genuina y pertinente no se somete al tribunal o al organismo administrativo, ellos pueden resolver las cuestiones de ley luego de

concederles el derecho de argumentación a los participantes."
*Producers Livestock Marketing Ass'n* v. *United States*, 241
F.2d 192, 196 (Cir. 10, 1957); confirmado en 356 U. S. 282
(1958); 1 Davis, *Administrative Law Treatise* (1958) págs.
407–437. Además, en el caso presente la Junta le dio a
conocer a los participantes las razones en las cuales fundaba
sus interpretaciones legales y luego dejó en suspenso su re-
solución y concedió nuevas vistas sobre el asunto, antes de
expresar su dictamen final.

### III

Las partidas específicas rechazadas por la Junta
en este caso son, como antes dijimos, las de estibado y cargado
de sacos de azúcar en camiones en los almacenes arrendados,
la renta de los almacenes, y, en parte, la transportación de la
factoría a los muelles, de la factoría a los almacenes arren-
dados, y de éstos a los muelles. Además, la Junta ordenó
una reducción de 50% de la partida de seguro terrestre y
seguro de huracán. Los peticionarios expresan repetida-
mente en su alegato, y así lo expresaron también ante la
Junta, que la desaprobación administrativa de esos gastos
plantea escuetamente una cuestión de derecho. Como ya
señalamos, esa cuestión se refiere, primero, al alcance de los
poderes de la Junta según los define el art. 8 de la Ley Azu-
carera, asunto que ya hemos considerado; y segundo, a las
razones que tuvo la Junta para rechazar esas partidas, en
otras palabras, a la interpretación administrativa del tér-
mino "gastos de embarque y mercadeo".

En su resolución de 7 de abril la Junta, luego de citar una
definición de diccionario del término "embarque", ([6]) hizo la
siguiente declaración:

"Creemos por lo tanto, que todos los gastos incurridos por la
Central desde el momento en que comienza el movimiento con-
tinuo de los sacos de azúcares desde los almacenes de la central

([6]) "Acción de depositar provisiones o mercancías en un barco o tren
para ser trasbordados." Diccionario de la Lengua Española, 17ma. ed.,
1947.

hacia su destino final son deducibles de acuerdo con las disposiciones de dicho Artículo dentro del criterio de 'razonabilidad' que nos permite usar el citado artículo, y que toda operación anterior a la rotura de estiba de sacos para cargar en los trucks o tren iniciando el movimiento ininterrumpido de esos sacos hacia su destino final, son operaciones de producción y no pueden ser comprendidos dentro del término 'embarque'."

Y añadió más adelante: "Por lo tanto, decidimos que la línea divisoria entre lo que es producción o proceso de elaboración y lo que es embarque debe tirarse entre el almacenaje y la rotura de estiba que inicia el movimiento continuo e ininterrumpido de los sacos de azúcar hacia su destino final". Esa interpretación del término "gastos de embarque y mercadeo" la basó la Junta explícitamente en su experiencia y su conocimiento "de la forma y manera que opera la industria azucarera en Puerto Rico," (⁷) y citó, también otras disposiciones de la Ley y los precedentes legislativos para apoyar su criterio.

La Junta rechazó la partida de renta de almacenes por los siguientes fundamentos:

"Además el Artículo 7 de la Ley Azucarera vigente dispone 'que los colonos que opten porque su participación en el producto de sus cañas sea liquidado en azúcar, gozarán de derecho de almacenaje en los almacenes de la Central hasta el día 31 de diciembre siguiente a la zafra durante la cual se produjeran dichos azúcares sin pago de cantidad alguna por el disfrute de dicho derecho'.

"Tal disposición claramente indica la decisión de la Legislatura de que el almacenaje gratis hasta la fecha indicada fuese otro de los beneficios a brindársele al colono como parte de su participación global en el producto del azúcar.

"Cuando se liquida a los colonos en azúcar, la participación de los colonos en los azúcares que produzcan sus cañas la central viene obligada a entregar al colono por disposición del Artículo 7 de la Ley Azucarera la totalidad de la participación del azúcar que le corresponda sin descuento alguno por concepto de al-

(⁷) El art. 10 de la Ley dispone que "Los miembros de la Junta deberán ser personas de reconocida capacidad y experiencia en la industria azucarera". 5 L.P.R.A. sec. 379.

macenaje de dicho azúcar hasta el 31 de diciembre del año en que se molieron las cañas del colono, ni por concepto de gastos incidentales al almacenamiento de dicho azúcar. En este caso no se autoriza a la central a descontar los gastos de embarque y mercadeo que hubieren porque el colono al vender su azúcar en el mercado, paga de su propio peculio los gastos de esa naturaleza en que incurra. No vemos disposición alguna en la Ley Azucarera para que en aquellos casos en que a los colonos se les liquida en dinero y la central se ve obligada a vender por su cuenta la participación de los colonos en el rendimiento de sus cañas descuente los gastos de almacenaje y los gastos incidentales al almacenaje en que éste incurra.

"Una simple comparación del procedimiento establecido en la Ley Azucarera para la liquidación de los azúcares de los colonos ya sea en azúcar o en dinero demuestra que ni la letra ni el espíritu de dicha Ley consideran los gastos de almacenamiento y los gastos incidentales a éstos, como gastos de embarque y mercadeo cuando el almacenamiento se efectúa antes de iniciarse el movimiento final del azúcar hasta su destino de entrega final.

"Se ha argumentado ante esta Junta que la cuestión de almacenaje gratis para los azúcares del colono cuando el colono opte porque se le hagan sus liquidaciones en azúcar solamente se refiere a aquellas centrales que poseen almacenes de su propiedad. Pero entendemos que la frase 'en los almacenes de la Central' que contiene el Artículo 7 de la Ley Azucarera, no implica que se exija título de propiedad en el almacén de parte de la central y la entendemos y la aplicamos dentro de una interpretación razonable de que la frase en sí lo que quiere decir es que sean almacenes que están en posesión y control de la central.

"Interpretar este Artículo en la forma argumentada por la central levantaría una seria cuestión de debido procedimiento de Ley en cuanto a trato discriminatorio entre una central que no cobra por el almacenaje del azúcar y otra central que cobre por tal concepto que podría violar la garantía constitucional del derecho a la igual protección de las leyes.

"Por tales fundamentos somos de opinión que una interpretación razonable del término 'gastos de embarque y mercadeo' contenido en el Artículo 8 no puede incluir gastos de almacenaje o de almacenes arrendados cuando ese almacenaje se hace y frecuentemente por un largo período de tiempo antes de comenzar el movimiento continuo e ininterrumpido de los sacos de azúcar en el embarque hacia su destino final."

La Junta no hizo pronunciamientos específicos sobre las demás partidas, amparándose implícitamente en la norma general que había trazado.

Los peticionarios sostienen que es erróneo el dictamen de la Junta, por las siguientes razones: 1. Desde por lo menos 1943 Central Monserrate ha arrendado almacenes y ha cargado esas rentas a los gastos de embarque y mercadeo, sin objeción alguna de los colonos o de los organismos oficiales; 2. En el año 1953, existía una Determinación de Precios (S.D. 877.5) para la industria azucarera, emitida por el Secretario de Agricultura de los Estados Unidos que expresamente autorizaba a las centrales a descontar las rentas por concepto de almacenes; 3. La central arrienda esos almacenes con el propósito de vender el azúcar cuando las condiciones del Mercado sean favorables, y de esa manera proteger sus intereses y los de los colonos; 4. La disposición de la Ley que ordena dar almacenaje gratis a los colonos, se refiere únicamente a aquellos que aceptan el pago en azúcar y no cubre, por tanto, a los que aceptan en dinero, como ocurre en el presente caso. Se observará que los peticionarios discuten exclusivamente la partida de rentas de los almacenes.

Es correcto que la prueba incontrovertida que ofreció Central Monserrate demostró que ella desde 1943 incluía, sin oposición, las rentas de almacenes en los gastos de embarque y mercadeo. También se demostró que otras centrales hacían lo mismo. Aún en la hipótesis de que esto constituya prueba de una práctica de la industria, algo que veremos no es enteramente correcto, ella no obliga a la Junta. La continua intervención del estado en los procesos económicos obedece precisamente a la necesidad de reformar las prácticas existentes; se hace en función de establecer nuevos balances entre los intereses en conflicto y en ánimo de proteger los grupos más débiles y más desarticulados política y económicamente. Dictaminar que las prácticas vigentes constituyen mandatos para la nueva reglamentación, sería crear el marco

ideal para la aplicación del cínico proverbio francés, "mientras más cambian las cosas más iguales permanecen". No es esa la función de la Junta, ni la nuestra.

Es igualmente correcto que el Secretario de Agricultura de los Estados Unidos mediante la Determinación de Precios (S.D. 877.5) permitía a las centrales descontar los gastos de almacenaje fuera de la central ("outside storage"). Conviene recordar, sin embargo, que no se trata de un choque entre el poder federal y el estatal en un área en que por imperativos constitucionales deba prevalecer el primero. Tal conflicto no existe y los peticionarios ofrecen la Determinación secretarial sólo por su fuerza persuasiva, como la actuación de un funcionario responsable de lidiar con estos problemas en otra esfera de gobierno.[8] Sin embargo, el argumento pierde casi totalmente su valor cuando consideramos, primero, que nuestra Ley Azucarera de 1951 contiene varias disposiciones[9] que no se ajustan a la citada Determinación secretarial y que resultan más favorables a los colonos, índice de que la Asamblea Legislativa nuestra, por razones que ella consideró suficientes, decidió ofrecer mayor protección a los colonos que la que hasta entonces le habían dado las autoridades federales e índice, desde luego, de que la Junta también puede apartarse de esa Determinación; y segundo que, según nos señala la Junta en su competente alegato, el 18 de enero de 1956 el Secretario hizo una nueva Determinación (21 F.R. 333, 334–335) en la cual explicó que: "Se ha eliminado la provisión que permitía a los manufactureros cobrarle los gastos de almacenaje fuera de la central a los productores por considerar que es causa de injusticias entre los manufactureros. La provisión se incorporó a la Determina-

---

[8] El argumento no se aplica a la partida de estibado y cargado de sacos en camiones, ya que la propia prueba de los peticionarios demostró que el Secretario no autorizaba esa partida.

[9] Así por ejemplo, la participación de los colonos en el azúcar tiene un máximo de 67.5 en la Determinación secretarial y uno de 68.0 en la Ley Azucarera. La Determinación no menciona los gastos de arrastre y arrimo que la central debe pagar al colono, mientras que la Ley sí lo hace.

ción durante los años de guerra, cuando los servicios de embarque estaban desorganizados, *pero anteriormente se le requería al manufacturero almacenar el azúcar crudo libre de gastos para el productor. La acción tomada en esta Determinación restablece las relaciones originales".* (Énfasis suplido.) Las injusticias señaladas se refieren, sin duda, al hecho de que nunca se le permitió a las centrales que poseían almacenes en sus terrenos descontarle a los colonos el gasto de almacenar el azúcar, mientras que por varios años y debido a las razones ya apuntadas, el Secretario permitió ese descuento a las centrales que tomaban almacenes en arrendamiento. La Determinación de 1956 aclara cuál había sido la verdadera práctica en la industria.(¹⁰) El hecho de que la Central arrendase los almacenes para alegadamente tomar provecho de las fluctuaciones del mercado, no desvirtúa las anteriores consideraciones.

 Tampoco tiene mayor importancia que la disposición de la Ley sobre almacenaje gratis mencione únicamente a "los colonos que opten porque su participación en el producto de sus cañas le sea liquidada en azúcar". Las facultades de la Junta para dictaminar sobre los gastos de embarque y mercadeo bajo las disposiciones del art. 8 no quedan afectadas por esa mención específica. Tanto a los colonos que aceptan el pago en azúcar como a aquellos que lo aceptan en dinero les concede la Ley igual compensación por sus azúcares y mieles y establece procedimientos idénticos para realizar el cómputo. Arts. 4 y 5. No pueden derrotarse las claras realidades económicas de la industria, ya descritas, y los poderes de la Junta mediante la aplicación mecánica de un canon de interpretación, como nos sugieren los peticionarios. Se trata,

---

(¹⁰) La Ley de 1938, ya citada disponía en su sec. 11 que "podrá la Central descontar para gastos de ensacado, flete, aseguro marítimo, comisiones, arbitrios insulares y todo otro gasto relacionado con la venta del azúcar en el mercado de Nueva York, una cantidad que no excederá de veinticinco (25) por quintal, libre de todo impuesto... Nos parece que esa enumeración legislativa aclara también cuáles habían sido las prácticas en la industria.

a nuestro juicio, de una mera adición por vía de énfasis. Cf. *Banco de Ponce* v. *Secretario de Hacienda*, 81 D.P.R. 442, 449–540 (1959) ; *Dávila et al.* v. *Superintendente de Elecciones*, 82 D.P.R. 264 (1961).

Hemos examinado también la opinión disidente emitida por uno de los miembros de la Junta y no hay nada en ella que haga variar nuestro criterio. Contiene los mismos argumentos ya considerados.

En resumen, consideramos que la conclusión general establecida por la Junta Azucarera sobre los "gastos de embarque y mercadeo", así como las aplicaciones específicas de esa conclusión hechas en el caso presente, ([11]) son completamente razonables y están conformes con los propósitos de la Ley y las circunstancias económicas y de organización industrial a ser regidas por ellas. Esos criterios deben merecernos, como en el pasado, "gran consideración y respeto". *Colonos de Caña de Santa Juana, Inc.* v. *Junta Azucarera*, 77 D.P.R. 392, 396 (1954) y sentencias allí citadas. Ninguna de las objeciones sometidas por los peticionarios, ni la totalidad de ellas, son suficientes para desechar esos criterios. Cf. *South Porto Rico Sugar Co.* v. *Junta Azucarera*, 82 D.P.R. 470 (1961).

*Se confirmará la resolución de la Junta Azucarera, con costas y gastos a los peticionarios de conformidad con el art. 33 (5 L.P.R.A. sec 402) de la Ley Azucarera.*

El Juez Asociado Sr. Dávila no intervino.

([11]) La reducción en la partida de seguro fue el resultado de un estudio actuarial que, como antes señalamos, se le sometió a los peticiona-

rios y fue, además, objeto de prueba oral. Los peticionarios no nos someten objeción específica alguna contra ese estudio.