SOUTH PORTO RICO SUGAR COMPANY, peticionaria, *v.* JUNTA AZUCARERA DE PUERTO RICO, demandada.

Número 35

*Sometido:* 1 de mayo de 1960. *Resuelto:* 19 de abril de 1961.

*James R. Beverley, R. Castro Fernández* y *Francisco Castro Amy,* abogados de la peticionaria; *Alejandro Romanace,* abogado de la demandada.

EL JUEZ ASOCIADO SEÑOR SERRANO GEYLS emitió la opinión del Tribunal.

Se nos somete de nuevo una controversia nacida de la aplicación del art. 6 de la Ley Azucarera (¹) (5 L.P.R.A. sec. 375) y particularmente de la disposición que concede a las centrales la facultad de designar el sitio en el cual los colonos han de entregar sus cañas. Se trata esencialmente de una disputa sobre los hechos. La Junta Azucarera, luego de los procedimientos de rigor, hizo las siguientes conclusiones:

.     .     .     .     .     .     .     .     .

"De la evidencia sometida ante la Junta, el sistema de arrastre y arrimo utilizado por Central Guánica durante las zafras de 1954, 1955 y 1956 fue el de recibir la caña de sus colonos en la forma siguiente: (1) en las fincas de dichos colonos proveyendo la Central los medios de transportación desde la finca del colono hasta el molino; (2) en desvíos situados a menos de medio kilómetro de la salida normal y natural de la finca del colono, proveyendo el colono los medios de transportación hasta el desvío y trasbordando allí las cañas a un ferrocarril público o privado, propiedad de la Central Guánica; (3) recibir cañas en desvíos situados a medio kilómetro o más de la salida normal o natural de la finca del colono, proveyendo el colono los medios de transportación hasta el desvío y trasbor-

---

(¹) "Para el arrastre y arrimo de las cañas de los colonos, regirán las siguientes cláusulas y condiciones:

"(a) La central podrá proveer los medios de transportación para las cañas de sus colonos desde la finca del colono hasta la central, y cuando así los provea, compensará al colono con siete y medio (7 ½) centavos por tonelada de caña entregada, por concepto de arrimo; *Disponiéndose*, que si durante la zafra de 1950 alguna central hubiese pagado una suma superior por este concepto, este último será el tipo que regirá para dicha central. En caso de que la central no provea los referidos medios de transportación, vendrá obligada a compensar al colono en la forma y medida más adelante establecida, por la transportación de dichas cañas desde la finca del colono hasta el sitio de entrega designado por la central, ya bien dicha transportación se efectúe con equipo propio del colono o arrendado por él. La central estará obligada a proveer a todos sus colonos, sin costo alguno para éstos, servicio de grúa y el personal necesario para su operación en cada sitio que la central designe para la entrega de cañas. Cuando se trate de un colono nuevo o uno que desee cambiar de sitio de entrega de las cañas y la central y el colono no se pongan de acuerdo en

dando allí las cañas al ferrocarril público o privado y (4) recibir cañas en el batey de la Central siendo dichas cañas transportadas por el colono en camiones de su propiedad o arrendados por él.

"De las declaraciones de todos los colonos que acudieron a las vistas celebradas se probó que Central Guánica no efectuó cambio alguno en su sistema de recibir y transportar cañas y que al igual que en las zafras de 1952 y 1953 siguió usando para las zafras de 1954, 1955 y 1956 el mismo sitio de entrega para recibir las cañas de los colonos en los distintos desvíos asignados a ellos desde tiempo inmemorial y transportando dichas cañas desde esos desvíos hasta el batey de la Central por medio del ferrocarril público conocido por Puerto Rico Railroad and Transport Company y por el ferrocarril privado, propiedad de la Central, controlando Central Guánica la entrega de cañas de colonos en esos desvíos y el movimiento de los vagones de carga de los dos ferrocarriles y pagando sin cargo al colono, por el flete de esa caña de colonos, desde esos desvíos hasta el batey de la Central.

"Pero a pesar de que surje claramente de toda la evidencia sometida que Central Guánica siguió recibiendo las cañas de sus colonos en los mismos sitios que las había recibido desde tiempo inmemorial y en los mismos sitios que las recibió durante las zafras de 1952 y 1953 y que pagó a sus colonos la compensación por arrastre y arrimo y servicio de grúa requerida

cuanto al sitio de entrega, la Junta determinará el sitio en que la central deberá recibir las cañas del colono, de entre los designados por la central.

"(b) En los casos en que el colono haga la transportación de sus cañas, la central le compensará a razón de quince (15) centavos básicos por tonelada de caña transportada, por concepto de arrimo, más la cantidad de cinco (5) centavos por tonelada por kilómetro, desde la finca al sitio de entrega, siempre y cuando la distancia a recorrer desde la finca al sitio de entrega sea de medio kilómetro o más; *Disponiéndose*, que el colono tendrá derecho a recibir la compensación básica de quince (15) centavos aunque la distancia a recorrer desde la finca al sitio de entrega sea menor de medio kilómetro. La distancia, a los efectos de esta compensación, se determinará desde la salida normal o natural de la finca del colono en donde se cortó la caña hasta el sitio de entrega designado por la central; si al determinarse el peso y la distancia en el arrastre y arrimo de las cañas resultare una fracción de kilómetro o tonelada, se pagará la compensación en ambos casos por la fracción proporcionalmente.

"(c) En los casos en que la central haya venido usando vías portátiles para el arrastre de las cañas de un colono, la central vendrá obligada

por el artículo 6 citado, Central Guánica se niega a pagarle a sus colonos esa compensación legal durante las zafras de 1954, 1955 y 1956 bajo el subterfugio legal de que había cambiado su sistema de entrega y transportación de cañas porque desde el año 1954, la Central actuó como agente del colono para transportar sus cañas por el ferrocarril público hasta el batey de la Central . . .

.      .       .       .        .         .        .        .       .       .

" . . . [Central Guánica] formalizó, (A) 595 cartas-contratos con sus colonos para las zafras de 1954, 1955 y 1956, señalando el sitio de entrega de las cañas como el batey de la Central, pero sin mencionar la llamada cláusula de agencia con la Porto Rico Railroad Co.; (B) nueve cartas-contratos señalando el batey de la central como el sitio de entrega incluyendo la cláusula de la llamada agencia de la Porto Rico Railroad Co.; (C) Veintidós cartas-contratos señalando el sitio de entrega en ciertos desvíos e incluyendo la llamada cláusula de agencia de la Porto Rico Railroad Co.; (C-1) Seis cartas-contratos señalando ciertos desvíos como sitio de entrega sin incluir la cláusula de agencia de la Porto Rico Railroad Co.; (C-2) nueve escrituras señalando ciertos desvíos como sitios de entrega sin incluir la llamada cláusula de agencia de la Porto Rico Railroad Co.; (D) diez y nueve cartas-contratos indicando el batey como sitio de entrega e incluyendo la cláusula de agencia de la Porto Rico Railroad Co.; (D-1) seis colonos por escrituras indicando el batey como el sitio de entrega y con cartas-contratos sin cláu-

a suplir al colono, sin costo alguno para éste, dichas vías portátiles y material rodante necesarios, y asimismo vendrá obligada a pagar al colono cinco centavos (5¢) por tonelada de caña por concepto de arrimo. La central podrá descontinuar la práctica de suplir directamente, o a través de cualquier entidad subsidiaria, agente o contratista, vías portátiles a sus colonos, siempre que obtenga la aprobación previa de la Junta para así hacerlo. La Junta tendrá facultad para ordenar a cualquier central que descontinúe el uso de cualquier sistema de arrastre que a juicio de la Junta resulte perjudicial a los intereses de los colonos o de la industria.

"(d) El pago de la compensación anteriormente provista por concepto de arrastre y arrimo deberá efectuarse por la central semanalmente.

"(e) Las centrales serán responsables a los colonos de las cañas de éstos desde el momento en que las reciban en el sitio de entrega designado por la central, excepto en casos de fuerza mayor, o fuera del control de la central.

"La central en ningún caso vendrá obligada a pagar más de un dólar por concepto de arrastre y arrimo.

.      .        .        .         .         .        .          .       ."

sula de agencia de la Porto Rico Railroad Co.; (E) ocho cartas-contratos con entregas por trucks y por desvíos incluyendo cláusula en cuanto a la Porto Rico Railroad Co. y (F) cuatrocientos un colonos que no firmaron ninguna clase de contratos en un total de mil setenta y cinco (1,075)* colonos durante las zafras de 1954, 1955 y 1956. (Véase Exhibit C de Central Guánica—Oct. 8, 1957.)

"Pero a pesar de todos estos contratos designando como sitio de entrega el batey de la Central, todos los colonos que declararon en las vistas ante la Junta declararon lo mismo; o sea, que en las zafras de 1954, 1955 y 1956 cada uno de ellos siguió entregando sus cañas en el mismo sitio que las habían entregado siempre; o sea, en los desvíos desde donde tiempo inmemorial el ferrocarril público y el privado habían recogido las cañas para llevarlas a la Central; otros, los que no entregaban cañas en desvíos pero sí en sus propias fincas al ferrocarril público o al privado declararon que siguieron entregando cañas en el mismo sitio, pero que para las zafras de 1954, 1955 y 1956 Central Guánica no les pagó el arrimo de siete centavos y medio por tonelada entregada a que tenían derecho por ley, aunque sí les pagó esa compensación durante las zafras de 1952 y 1953, que en ningún momento se entendieron con el ferrocarril público para la transportación de esas cañas, que nunca le pagaron nada al ferrocarril, ni tampoco controlaban ellos el movimiento de los vagones del ferrocarril; que ellos le avisaban, igual que en años anteriores, al inspector de colonos o a la central cuando iban a cortar y a entregar cañas, que si firmaron contratos en ningún momento se les habló de que la Central iba a actuar como agente de ellos, los colonos, para transportar las cañas de los colonos por el ferrocarril público y que Guánica no les pagó el arrastre de cañas a los desvíos ni el arrimo en sus fincas durante las zafras de 1954, 1955 y 1956 como lo había hecho en las zafras de 1952 y 1953 cumpliendo con la Orden de la Junta del día 20 de septiembre de 1957.

"Se estipuló además por el abogado de Central Guánica y el Asesor Legal de la Junta, que todos los colonos que estuvieron presentes y todos los demás colonos de Central Guánica en iguales circunstancias que éstos; o sea, que habían firmado cartas-contratos de que el sitio de entrega desde la zafra de 1954 a 1956 sería el batey de la central y fueren adversamente afec-

---

* por zafra

tados por dicha designación declararían lo mismo que han declarado los colonos que tomaron la silla de los testigos en la vista celebrada en ese día, el día 4 de junio de 1957, entendiéndose sin embargo, que hay un grupo de colonos que se beneficiarían de la designación del batey como sitio de entrega en vez del desvío."

Por razón de esas conclusiones, la Junta determinó, como cuestión de derecho, que los colonos entregaron las cañas a la Central en los desvíos del ferrocarril, "no empece el hecho de que la Central había designado el batey del molino en las cartas-contratos como el punto de entrega". Ordenó, en consecuencia, que la Central hiciera los pagos pertinentes por arrastre, arrimo y uso de grúa considerando los desvíos y no el "batey" como sitios de entrega. Se fundó en las disposiciones de la ley y en *Eastern Sugar Associates* v. *Junta Azucarera*, 77 D.P.R. 358 (1954).

Sostiene la peticionaria que los hechos establecidos por la Junta no encuentran apoyo en la prueba y que ésta demuestra que el sitio de entrega era el "batey" de la central. No nos detendremos en este punto. Basta decir que hemos examinado cuidadosamente la voluminosa prueba oral y documental que consta en autos y la misma sostiene plenamente las conclusiones de la Junta. Todos los testigos, sin excepción, e incluyendo a varios altos ejecutivos de la peticionaria, afirmaron repetida e invariablemente que todo el procedimiento de entrega de las cañas durante las zafras de 1954, 1955 y 1956 había sido exactamente igual al que por varias décadas se había venido utilizando por las partes, incluyendo el trasbordo y entrega de las cañas en los desvíos del ferrocarril.

La peticionaria aduce, sin embargo, que a virtud de ciertas cartas enviadas a numerosos colonos, ella designó el "batey" de la central como sitio de entrega y se convirtió, además, en "agente del colono" para hacer los arreglos necesarios con el ferrocarril y pagar "por cuenta del colono" los fletes correspondientes. Por lo tanto, añade, las actua-

ciones de la peticionaria en los desvíos en los años 1954–1956, aunque idénticas a las de los años anteriores, fueron realizadas en su carácter de agente de los colonos.

Estas alegaciones de la peticionaria nos obligan a resumir los principios que, luego de una amplia y cabal discusión del problema, establecimos en *Eastern Sugar Associates* v. *Junta Azucarera*, supra, opinión del Juez Presidente, señor Snyder. En ese pleito, la central también había enviado cartas a los colonos designando el molino como el sitio de entrega, pero, también al igual que en el caso presente, había hecho todos los arreglos físicos y legales para la entrega en un punto intermedio. Reconocimos: 1. el derecho de la central, bajo el art. 6, a designar su molino como el sitio de entrega y a designar otros sitios de entrega en adición al molino; 2. que nada hay en el art. 6 que exija que el sitio de entrega sea también el sitio donde se pese la caña; 3. que dicho artículo no requiere que la central designe de manera formal los sitios de entrega, por escrito u oralmente, y que la conducta de las partes es suficiente para hacer aplicable el art. 6; 4. que "De igual modo, la designación por carta de un sitio de entrega en contravención de los hechos no tiene efecto legal. Bajo el art. 6 lo decisivo es lo que las partes hacen, no lo que dicen . . ."; 5. que aun en el supuesto de que en virtud de las cartas se hubiera celebrado un contrato, éste sería nulo por estar en conflicto con el art. 6; y 6. que el citado artículo exige que la central provea servicio de grúa y personal libre de costo en los sitios de entrega.

En el caso que examinamos, contrario al caso de *Eastern*, las cartas enviadas a los colonos no especificaban que la central tomaría posesión física de las cañas en los desvíos, para luego transportarlas por su cuenta hasta el molino. Decían como ya señalamos, que el sitio de entrega sería el molino y otras añadían que la central se constituiría en agente de los colonos para hacer los arreglos con el ferrocarril relativos a la transportación de las cañas, desde los desvíos hasta

el molino. Sin embargo, en vista de todas las demás circunstancias probadas, esa diferencia es insustancial.

La prueba demostró, (²) sin lugar a dudas, que la peticionaria envió dichas cartas a sus colonos sin explicaciones orales o escritas de índole alguna; que los colonos las recibieron como parte de los papeles que a diario les llegaban de la central; que varios las firmaron sin leerlas, otros sin entenderlas y otros simplemente a base de las relaciones de confianza, o si se quiere de paternalismo, que existían entre ellos y los agentes de la central; que en ningún momento tuvieron la menor noción de que la firma de esas cartas iba a significarles una merma en sus ingresos de arrastre y arrimo; que luego las operaciones de entrega y transportación se realizaron de idéntica manera que en los años anteriores y los colonos no tuvieron intervención alguna en las operaciones del ferrocarril; que fue más tarde, al hacerse la liquidación de arrastre y arrimo, que supieron que aquellos documentos, aparentemente rutinarios e inocentes, habían establecido un cambio en el sitio de entrega y habían creado una relación de agencia entre ellos y la central para que ésta, a nombre de ellos, negociara con el ferrocarril; y que se hubiesen negado a aceptar esa transacción y hubiesen cambiado la molienda de sus cañas a otra central, si hubiesen tenido la mínima sospecha de que se les iba a pagar menos que en los años anteriores.

Es obvio que ni la Junta Azucarera ni este Tribunal pueden permitir que por medio de una ficción legal, no importa lo hábil e ingeniosa que parezca a primera vista, se destruyan los derechos que la ley otorga a los colonos y los principios de trato equitativo que deben regir las relaciones entre las partes. Las centrales tienen, no hay duda, perfecto derecho a designar los sitios de entrega de las cañas de sus

---

(²) Dicha prueba cubre únicamente los casos de varios colonos, pero se recordará que las partes estipularon que todos los colonos adversamente afectados declararían lo mismo.

colonos.   Pero en determinadas circunstancias, ([3]) los colonos tienen a la vez el derecho de oponerse al cambio y·de acudir a la Junta para que ésta designe el sitio de entrega, y más importante aún, tienen el derecho, garantizándoles por el art. 3 de la Ley Azucarera (5 L.P.R.A. sec. 372), de hacer arreglos con las centrales para moler sus cañas donde les resulte más beneficioso.

Del debido ajuste entre esos derechos y de la experiencia habida en el caso de la *Eastern* y en el presente, surge en claros relieves la necesidad de que al efectuar un cambio en la ubicación de los sitios de entrega, la central informe debidamente a sus colonos las consecuencias legales, y sobre todo económicas, que apareja el cambio y así se asegure que el consentimiento de ellos no es producto de la ignorancia, la rutina o la confianza en que todo seguirá igual.   Y el cambio, desde luego, debe realizarse de verdad, y no meramente para servirle de velo a un artificio legal.   La Junta Azucarera tiene no sólo el poder, sino la obligación, de investigar estas situaciones y de ofrecer la necesaria protección a todas las partes. ([4])

*Se confirmará la resolución de la Junta Azucarera con costas y gastos a la peticionaria de conformidad con el art. 33 (5 L.P.R.A. sec. 402) de la Ley Azucarera.*

---

([3]) Art. 6(a) de la Ley Azucarera.

([4]) Las descritas normas gobiernan también el caso de La Reparada Development Co.   Estamos convencidos, como lo estuvo la Junta, que la solicitud de La Reparada a la central para entenderse directamente con la compañía de ferrocarril, tuvo por base exclusivamente su deseo de cobrar gradualmente la suma de alrededor de $20,000 que le adeudaba el ferrocarril, y en modo alguno el de realizar un cambio en el sistema de arrastre y arrimo que habría de costarle $4,000 al año.   Este testimonio no fue controvertido por los testigos de la peticionaria y la prueba demostró, además, que aparte del hecho ya explicado sobre el pago al ferrocarril, el sistema ·de entrega y transportación siguió funcionando en condiciones idénticas a las de las zafras anteriores.