South Porto Rico Sugar Corporation, peticionaria, *v.* Junta Azucarera de Puerto Rico, recurrida.

*Número:* 37      *Resuelto:* 8 de abril de 1963

*James R. Beverley, F. Castro Amy* y *A. Castro Fernández,* abogados de la peticionaria; *Lydia F. Marcos,* abogada de la

Junta Azucarera de Puerto Rico; *Alejandro Romanace, Osvaldo De La Luz Vélez* y *Carlos Chavier Stevenson,* abogados del *amicus curiae,* Autoridad de Tierras de Puerto Rico.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

La Ley Azucarera de Puerto Rico, Ley Núm. 426 de 13 de mayo de 1951, según enmendada, 5 L.P.R.A. secs. 371–405, dispone, *inter alia,* que las centrales azucareras harán las liquidaciones del azúcar correspondiente a los colonos tomando como valor del azúcar el precio promedio de los azúcares de Puerto Rico *C.I.F. New York* correspondiente a la quincena o mes en que los colonos hayan entregado la caña a la central, y además dispone que de ese precio la central podrá descontar los gastos de embarque y mercadeo "realmente incurridos", cuyos gastos deberán ser previamente aprobados por la Junta Azucarera. Arts. 7 y 8 de la Ley, 5 L.P.R.A. secs. 376 y 377.

También dispone la Ley, en su citado Art. 8, que si la Junta o cualquier colono no estuviere conforme con la razonabilidad o corrección de dichos gastos de embarque y mercadeo, la Junta, a petición del colono o *motu proprio,* celebrará una vista para dilucidar el asunto, no pudiendo la central hacer la liquidación final hasta que la Junta resuelva la controversia.

Por estar la Junta Azucarera encargada de una detallada reglamentación y supervisión de la industria azucarera de Puerto Rico, dicha Junta, como es corriente en estos casos, está facultada por ley para examinar testigos, tomar declaraciones, hacer indagaciones, inspecciones e investigaciones, celebrar audiencias y realizar todos los actos que sean necesarios y propios en el desempeño de sus deberes. Art. 23 de la Ley, 5 L.P.R.A. sec. 392.

En el cumplimiento de sus funciones la Junta Azucarera envió a la South Porto Rico Sugar Corporation (Central Guánica) un formulario sobre gastos de embarque y mercadeo de azúcar solicitándole lo llenase y que lo devolviese a la Junta "a la mayor brevedad". A los cuatro meses de esa comunicación de la Junta, como la Central no había devuelto el mencionado formulario, la Junta, mediante orden al efecto, le dio 17 días a la Central para que sometiese el formulario o que de lo contrario compareciese al expirar dicho término, en determinado día y hora, ante la Junta para mostrar causa por qué no debía procederse contra la Central de acuerdo con el Art. 23 de la Ley, 5 L.P.R.A. sec. 392.

Iniciada una investigación por la Junta y luego de otros trámites que no es necesario relatar y de una vista sobre los gastos de embarque y mercadeo que la Central descontó a los colonos durante los años 1955–1959, ambos inclusive, la Junta y la Central llegaron a un acuerdo sobre varias partidas en controversia pero quedó pendiente para discutirse la partida de gastos del embarque de azúcar a granel (*bulk sugar*), en relación con la cual se estipularon una serie de hechos en 18 de enero de 1961.

Es deber de la Junta sobre este particular ver que las partidas de gastos de embarque y mercadeo informadas por las centrales sean correctas, pues como el azúcar se vende *C.I.F. New York* (y por lo tanto dichos gastos se le descuentan a los colonos por las centrales del precio del azúcar) si esos gastos fueron inflados se perjudicaría indebidamente a los colonos. Es fácil ver que si los gastos informados son legítimos y correctos, la situación es legal y justa; pero si las centrales manipulan la contabilidad de esos gastos de manera que ellas obtengan ganancias indebidas en las operaciones de embarque y mercadeo, entonces la situación es injusta e ilegal.

En el caso de autos la Junta objetó la partida a deducirse a los colonos por gastos de embarque del azúcar en Puerto

Rico, informada por la Central, por dos motivos. Uno es que, señala la Junta, la Central hizo una ganancia en ese proceso de embarque mediante un sistema de corporaciones afiliadas (*sister corporations*) poseídas todas por una corporación matriz (*parent or holding company*) y estima que esa ganancia no es un gasto *realmente incurrido* (contrario a lo que exige la ley) por la Central en el embarque del azúcar y que no debe descontársele de los haberes de los colonos. El otro motivo es que la bonificación por despacho acelerado (*dispatch money*) obtenida por las corporaciones afiliadas representa una economía en el gasto de embarcar el azúcar, y no es por lo tanto tampoco un gasto realmente incurrido, y por ello no debe descontársele del precio del azúcar a los colonos. Sostiene la Junta que mediante ese sistema de corporaciones afiliadas se frustra la Ley Azucarera y se viola la política pública.

La posición de la Central Guánica es que procede el descuento de esas cantidades de los haberes de los colonos porque quien hizo la ganancia mencionada y quien obtuvo la bonificación por despacho acelerado no fue South Porto Rico Sugar Corporation (Central Guánica) sino que fueron otras corporaciones.

Puede apreciarse que la Junta descorrió el velo corporativo para ver lo que realmente ocurre tras los certificados de incorporación. Se plantea, como señala en su alegato el *amicus curiae*, si puede una central azucarera o sus dueños, mediante la organización de varias corporaciones afiliadas, circundar un mandato legislativo, en este caso el contenido en el Art. 8 de la Ley Azucarera de cobrarle o deducirle a los colonos por concepto de gastos de embarque y mercadeo solamente los gastos *realmente* incurridos. Es necesario que examinemos esa situación más de cerca para ver si estuvo justificada la Junta.

De acuerdo con la antes mencionada estipulación de 18 de enero de 1961 y la prueba presentada se puede hacer la siguiente relación de hechos:

(1) La South Porto Rico Sugar Corporation (Central Guánica) es una corporación doméstica que se dedica a la manufactura de azúcar en Ensenada, Puerto Rico.

(2) Mar Ancha Corporation (Mar Ancha) es una corporación organizada en Delaware y desde el año 1957 se dedica en Puerto Rico al embarque de azúcar a granel por el puerto de Ensenada.

(3) En 1957 Mar Ancha compró las facilidades y el activo fijo y pasivo de Administradora de Ingenios, C. por A. (Administradora), una corporación organizada en la República Dominicana. Antes de esa fecha Administradora operaba el negocio de embarque que ahora posee y opera Mar Ancha.

(4) South Puerto Rico Trading Corporation (Trading) es una corporación organizada en Nueva York. Se dedica a comprar, vender y transportar por la vía marítima el azúcar que produce la Central Guánica.

(5) La South Puerto Rico Sugar Company de New Jersey es y ha sido desde el principio la dueña de todas las acciones de todas las corporaciones arriba mencionadas y era también la accionista principal de Administradora. [1]

(6) Los oficiales principales de esas cuatro corporaciones (Central Guánica, Mar Ancha, Trading y South P.R. Sugar Co. of N.J.) son los mismos, a saber: Presidente, G. Douglass Debevoise; Tesorero, James W. Clauson; y Secretario, David D. Watkins, excepto que el Presidente de Mar Ancha es Edward C. Spaeth. Spaeth es también miembro de la Junta de Directores de South P.R. Sugar Co. of N.J., de Trading, de Mar Ancha y era de la ya disuelta Administradora.

---

[1] Dicha corporación matriz de New Jersey es también dueña de Central Romana Corporation, de Central Romana By-Products Co., Inc., de Magdalena Development Corp., y era dueña de la ya disuelta Yngenio Santa Fe, Inc., todas con operaciones en la República Dominicana, y de Guánica Agricultural Service Co., con operaciones en Puerto Rico. Las propiedades y operaciones de Yngenio Santa Fe pasaron a Central Romana Corporation. *Manual of Sugar Companies*, edición Núm. 35, 1960, Kittner ed., Fair, Withlock and Co., N.Y., págs. 115–118.

(7) Debevoise, el Presidente de Central Guánica, de Trading y de la Corporación de New Jersey es también director de esas tres corporaciones y de Mar Ancha. Clauson, el Tesorero de las cuatro corporaciones antes mencionadas es también director de todas ellas. Spaeth, el Presidente de Mar Ancha es director de la corporación de New Jersey, de Trading, de Mar Ancha y era Presidente y director de Administradora.

(8) La corporación matriz, South Puerto Rico Sugar Company de New Jersey, recibe todos los dividendos declarados por las mencionadas tres corporaciones subsidiarias suyas.

(9) Las facilidades de embarque de azúcar a granel de Mar Ancha están unidas a las facilidades de azúcar a granel de la Central Guánica, y se utilizan principalmente para el embarque del azúcar producida por la Central Guánica. Durante los años 1956–1958 Mar Ancha y su antecesora Administradora de Ingenios prestaron servicios mediante paga para el embarque de azúcares de otras centrales.

(10) Durante los años 1955–1959, los años en controversia en este caso, la Central Guánica vendió toda su producción de azúcar a su afiliada la Trading.

(11) Según la estipulación, "Las tarifas que cobraron Administradora de Ingenios y Mar Ancha Corporation en los años 1955–59 a la Central Guánica por el embarque de azúcar producido por ésta, incluyen ganancias respectivas para cada una de dichas corporaciones." Según el alegato de la peticionaria Central Guánica, "La Trading Corporation contrató los servicios de Administradora primero y después los de Mar Ancha para que realizaran los embarques a granel de los azúcares comprados a Central Guánica, por un precio que incluía una ganancia para dichas embarcadoras afiliadas y posteriormente le cobró a Central Guánica dichos gastos según lo disponía el contrato de venta." Puede verse que entre estas dos aseveraciones hay una aparente contradicción

pues en la primera se dice que Administradora y Mar Ancha le cobraron a la Central Guánica por el embarque del azúcar y la segunda aseveración dice que fue Trading la que le cobró a la Central Guánica por ese servicio. La posición de la Junta Azucarera es que precisamente en la realidad no hay ninguna contradicción porque, sostiene la Junta, Trading era una mera agente de la Central Guánica y porque la Junta impugna esta serie de corporaciones afiliadas que aparecen interviniendo en el proceso del embarque del azúcar.

(12) La Trading fletó los vapores para la transportación del azúcar y consecuentemente recibió de las compañías navieras las bonificaciones por concepto de despacho acelerado.

(13) Antes del año 1955, cuando el azúcar se embarcaba en sacos y no a granel, el azúcar producido por la Central Guánica era embarcado por terceras entidades tales como Bull Insular Lines y Lykes.

Habiendo visto lo que dice la organización corporativa en papel, es conveniente que veamos cómo funciona el embarque del azúcar a granel en la realidad. A continuación citamos del alegato del *amicus curiae*:

"En la factoría de South Puerto Rico Sugar Co., Inc. (P.R.) la caña llega al molino donde es convertida en azúcar. Desde el molino pasa al almacén por conductores y allí es depositada. En el almacén un embudo de presión de aire succiona el azúcar a granel y conduce el azúcar por un tubo hasta el techo del almacén donde cae en el conductor. En el momento que el azúcar que está en el tubo de succión cae en el conductor que la conduce sobre la borda del barco cae la cortina corporativa que viste Mar Ancha Corporation. Cuando el azúcar cruza sobre la borda para ser depositada en las bodegas del barco cae la cortina que cubre a la South Puerto Rico Sugar Co. Trading Corporation. Tenemos que en una operación que posiblemente no cubra una longitud de más de cien pies están funcionando tres corporaciones y los gastos de operación de dos de ellas con sus beneficios son cargados al colono en la parte que le corresponde a él. La operación de embarque en sí, que es continua, delata la naturaleza del misterio de los velos corporativos. En realidad y debido

a la naturaleza de las cosas los velos subsidiarios cubren una sencilla empresa integrada (*a single integrated enterprise*)."

Para resolver lo que más adelante expondremos, la Junta expresa que consideró los siguientes factores adicionales:

(1) "El contrato de arrendamiento de South P.R. Sugar Co. (Central Guánica) con sus compañías hermanas donde se les cedía el uso de un muelle privado para ser operado según sus instrucciones y bajo cargos también fijados por Central Guánica. (Exhibit 4 T.E. 100–105.) En ese contrato se ofrecían servicios al costo entre las partes y que después del término de 10 años las instalaciones y maquinarias pasarían a ser propiedad de Central Guánica sin pago alguno. La Junta concluyó que el contrato no se había efectuado con espíritu comercial independiente. (T.A. 38) A la fecha de este contrato, 18 de abril de 1955 (T.E. 70), estaba vigente 14 L.P.R.A. 56 que en lo pertinente lee: 'La existencia de transacciones entre compañías sobre una base que no sean aquellas que se hicieron con un espíritu comercial independiente se considerarán, prima facie, como evidencia de control o dominio'."

(2) "Tarifas provisionales mancomunadas fijadas por la Comisión de Servicio Público y aceptadas por South P.R. Sugar Co. y Mar Ancha Corporation para prestar servicios de almacenaje y embarque de azúcar a granel (Exhibit 5) (T.E. 106)."

(3) "La admisión de Mar Ancha Corporation (T.A. 36) en su solicitud de franquicia a la Comisión de Servicio Público de que eran de la firme opinión que no eran compañía de Servicio Público. Entonces consideraban el azúcar que embarcaba Mar Ancha como si fuera su propia azúcar puesto que de dedicarse a embarcar azúcar ajena no hubieran tenido duda alguna de que actuaba como empresa de servicio público. Administradora de Ingenios C. por A. embarcó solamente azúcar de Central Guánica (T.E. 113–114)."

(4) "En el 1954 cuando Central Guánica embarcaba el azúcar en sacos no había una corporación subsidiaria intermedia entre South P.R. Sugar Company (Central Guánica) y South P.R. Sugar Trading Corporation. El despacho ace-

lerado era insignificante en relación con el que se recibe por el embarque de azúcar a granel, ya que este último se realiza en un tiempo mucho menor que el que se necesitaba para el embarque de azúcar en sacos. (T.A. 40–41) (T.E. Llabrés 23)."

(5) "El historial de los negocios, dentro de la industria azucarera, de South P.R. Sugar Corp. of New Jersey y sus corporaciones subsidiarias en Puerto Rico (T.A. 50–51)."

(6) "Además de considerar esos factores la Junta Azucarera descartó la diversidad corporativa entre las entidades en cuestión, considerando que se bregaba con un producto común, el azúcar de los colonos, como parte de un sistema y como instrumentos económicos de los mismos accionistas, burlando así una política pública definida por la Ley Azucarera."

A la luz de todas esas circunstancias y luego de una serie de consideraciones de derecho que hace la Junta en su extensa Resolución, la misma resolvió lo siguiente:

1. "Considerar para los efectos de la Ley Azucarera que South Puerto Rico Sugar Co. of New Jersey, South Puerto Rico Sugar Co. (Central Guánica), Administradora de Ingenios C. por A., Mar Ancha Corporation (Sucesora de Administradora de Ingenios C. por A.), y South Puerto Rico Sugar Trading Corporation operan como una sola entidad y por lo tanto que Administradora de Ingenios C. por A., y Mar Ancha Corporation manipularon y manipulan con su propia azúcar cuando embarcaron y embarcan el azúcar producido por South Puerto Rico Sugar Co. (Central Guánica) a pesar de que ésta haya sido vendida a su subsidiaria South Puerto Rico Sugar Trading Corporation y sea ésta la que contrata el embarque del azúcar producido por South Puerto Rico Sugar Company (Central Guánica)."

2. "La Junta Azucarera tiene jurisdicción para examinar la contratación y puede determinar la razonabilidad de todos los contratos efectuados por South Puerto Rico Sugar Trading Corporation que se refieran a la manipulación del azúcar de South Puerto Rico Sugar Co. (Central Guánica)." "Resolver otra cosa sería permitir violaciones al Artículo 8 en particular y al espíritu de la Ley Azucarera e intención

legislativa en general al reducir la participación neta en el producto de las cañas de los colonos que fija dicha ley."

En virtud de lo resuelto, la Junta expidió la siguiente Orden:

"POR TANTO, para poder determinar cómo afecta la distribución de las operaciones de embarque y mercadeo del azúcar producido por South Puerto Rico Sugar Company (Central Guánica) entre corporaciones subsidiarias, la Junta Azucarera ordena, y antes de proseguir la vista de estos casos, a South Puerto Rico Sugar Co. of New Jersey y/o a South Puerto Rico Sugar Co. (Central Guánica) :"

"1. Que permita al Contador de la Junta, señor Ramón Llabrés, a su requerimiento, examinar los libros de Administradora de Ingenios C. por A., y de Mar Ancha Corporation para que éste pueda investigar los gastos realmente incurridos por embarcar el azúcar producido por South Puerto Rico Sugar Co. (Central Guánica) durante los años bajo investigación (1955 a 1959 ambos inclusives), o en su defecto que radique en la Secretaría de la Junta Azucarera todos los libros y documentos de las corporaciones antes mencionadas que reflejen esos gastos."

"2. Que radique en la Secretaría de la Junta Azucarera en o antes del 31 de mayo de 1961 todos los contratos efectuados por South Puerto Rico Sugar Co., con South Puerto Rico Sugar Trading Corporation en la manipulación del azúcar producida por South Puerto Rico Sugar Co. (Central Guánica) para que la Junta Azucarera pueda determinar cómo afectan esos contratos la razonabilidad de los gastos de embarque y mercadeo que South Puerto Rico Sugar Co. (Central Guánica) ha de deducir a sus colonos durante los años 1955–1959 ambos inclusives."

La peticionaria señala que la Junta Azucarera erró:

1. "Al descartar la diversidad corporativa entre South Puerto Rico Sugar Co. de New Jersey, Administradora de Ingenios C. por A., Mar Ancha Corporation, South Puerto Rico Sugar Corp. (Central Guánica) y South Puerto Rico Sugar Co. Trading Corp., y resolver que dichas corporaciones constituyen y operan como una sola entidad para los efectos de la Ley Azucarera vigente."

2. "Al resolver que bajo la Ley Azucarera existe una política pública en contra de las transacciones de una central azucarera con otras entidades afiliadas a ella."

3. "Al resolver que bajo la Ley Azucarera no es deducible a los colonos de la Central Guánica como gastos de embarque y mercadeo aquella parte de los gastos de embarque del azúcar, pagados por dicha central, que representa una ganancia para Administradora de Ingenios y Mar Ancha Corporation por los servicios que prestaron de embarcar el azúcar durante las zafras de 1955 a 1959."

4. "Al resolver que las bonificaciones que hayan sido pagadas a la South P.R. Sugar Co. Trading Corporation por las compañías navieras bajo contrato de flete entre ellas por concepto del despacho acelerado del embarque del azúcar comprado por la referida Trading Corporation a la Central Guánica durante los años 1955–1959, tienen que ser abonadas a los gastos de embarque y mercadeo de la Central Guánica durante dichos años."

5. "Al asumir jurisdicción y competencia para considerar la legalidad de las operaciones de Administradora de Ingenios y Mar Ancha Corporation bajo la Ley de Servicio Público de Puerto Rico."

■ No procede la revocación solicitada. Expondremos lo más suscintamente que podamos nuestras premisas y nuestra conclusión. Como es sabido, la industria azucarera en Puerto Rico es una industria revestida de interés público y puede ser reglamentada por la Asamblea Legislativa. *Mayagüez Sugar Co.* v. *Junta Azucarera,* 79 D.P.R. 423, 424 (1956); *Central San Vicente* v. *Junta Azucarera,* 78 D.P.R. 799, 803 (1955); *Roig* v. *Junta Azucarera,* 77 D.P.R. 342, 345, 348, 351 (1954), confirmado en 235 F.2d 347; *Eastern Sugar Associates* v. *Junta Azucarera,* 77 D.P.R. 358, 373 (1954), confirmado en 235 F.2d 347; *Vidal* v. *Fernández,* 104 F.2d 606, cert. negado en 308 U.S. 602.

La lectura de la Ley Azucarera de Puerto Rico, Ley Núm. 426 de 13 de mayo de 1951, 5 L.P.R.A. secs. 371 *et seq.* y de sus antecesoras, las Leyes Núm. 112 de 1937 y Núm. 221

de 1942, demuestra la relación estrecha que ha existido y existe entre esta industria y la comunidad puertorriqueña. ([2]) Un estimado oficial hecho en el año 1957 indicó que la producción de azúcar en Puerto Rico representa un potencial ingreso de aproximadamente 150 a 170 millones de dólares anuales. Exposición de Motivos de la Ley Núm. 29 de 6 de junio de 1957, Leyes de ese año, pág. 58. Mediante dicha Ley Núm. 29 de 1957, 5 L.P.R.A. secs. 415–419, la Asamblea Legislativa estableció un programa de pagos de incentivos para gastos de siembras nuevas de caña de azúcar, declaró que es la política pública del Estado Libre Asociado estimular la producción de esa industria, y asignó un millón de dólares del tesoro insular para dichos fines. ([3]) En su Mensaje a la Asamblea Legislativa de 14 de febrero de 1963 el Gobernador de Puerto Rico expresó lo siguiente:

"Hace 6 años iniciamos un programa de incentivos directos a los agricultores para que renueven sus plantaciones. Este programa ha costado $8.4 millones en los últimos 6 años. Además hemos fortalecido la investigación y dado instrucciones de que se ponga mayor esfuerzo educativo en el agricultor de cañas."

Por décadas la Asamblea Legislativa de Puerto Rico ha tenido una política pública en relación con la industria azu-

---

([2]) Para antecedentes, los cuales en gran parte son la causa que produjo esa legislación, pueden verse Clark and Associates, *Porto Rico and its Problems,* una publicación del Brookings Institution, 1930; Picó and Haas, "Puerto Rico" en *The American Empire,* Haas ed., 1940; Tugwell, *Investigation into Administrative Responsibilities Under the 500 Acre Limitation on Land Holdings,* un informe al Secretario de lo Interior de los E.U., 1941; Novas, *La Central Azucarera como Empresa de Servicio Público,* 8 Rev. C. Abo. P.R. 342 (1945); Tugwell, *The Stricken Land,* 1947; Perloff, *Puerto Rico's Economic Future,* 1950; Eastman & Marx, *Ships and Sugar,* 1953; Acosta-Velarde, *Consideraciones Sobre la Ley Azucarera de Puerto Rico,* en la Revista del Café (P.R.), Sept. 1953, pág. 13; Hanson, *Transformation,* 1955.

([3]) Para fines de comparación, nótese que en ese año económico de 1956–57 la asignación de la Asamblea Legislativa para toda la Rama Judicial de Puerto Rico fue $3,087,708.

carera.(⁴) La Ley Azucarera vigente, Ley Núm. 426 de 1951, 5 L.P.R.A. secs. 371 *et seq.*, reglamenta las relaciones y contratos entre los colonos (los agricultores productores de caña) y las centrales, establece la compensación que percibirá el colono por gastos de arrastre y arrimo, establece el procedimiento que deben seguir las centrales para determinar el rendimiento de azúcar de las cañas de los colonos, determina la participación mínima de los colonos en los azúcares y en las mieles producidas, reglamenta, como hemos visto, los descuentos por concepto de embarque y mercadeo que podrán hacer las centrales e impone ciertas obligaciones y establece ciertos derechos entre los colonos y las centrales. Uno de los propósitos de esa legislación, la vigente y la anterior, era y es proteger a los colonos—más débiles económicamente y en cuanto a conocimientos sobre la técnica industrial del azúcar—frente a las centrales y garantizarles, al menos en la ley, un trato justo en sus relaciones con los molinos. *South Porto Rico Sugar Co.* v. *Junta Azucarera*, 82 D.P.R. 470, 477 (1961); *Roig* v. *Junta Azucarera*, 77 D.P.R. 342, 352 (1954); *Godreau* v. *Comisión de Servicio Público*, 71 D.P.R. 649, 659 (1950).

■ Luego de las anteriores consideraciones sobre el contenido de interés público de la industria azucarera en Puerto Rico y sobre la naturaleza de nuestra legislación sobre el particular, corresponde que veamos si, operando en esa realidad, la Junta Azucarera estuvo justificada en descorrer el velo corporativo. Los textos y los casos siguen citando el ya famoso pronunciamiento del Juez Sanborn emitido en el caso rector de *U.S.* v. *Milwaukee Refrigerator Transit Co.*, 142 Fed. 248, 255 (1905) donde dijo: "Si alguna regla puede expresarse . . . es que como regla general se respetará la personalidad jurídica de las corporaciones, a menos que haya

---

(⁴)Ley Núm. 112 de 13 de mayo de 1937; Ley Núm. 221 de 12 de mayo de 1942; Ley Núm. 426 de 13 de mayo de 1951; Ley Núm. 29 de 6 de junio de 1957.

razón suficiente que justifique hacer lo contrario; pero, cuando el principio de la personalidad jurídica corporativa se utiliza para derrotar la política pública, justificar la inequidad, proteger el fraude o defender el crimen, las corporaciones son consideradas como asociaciones de personas naturales."

■ Que el velo corporativo se descorrerá cuando la personalidad corporativa se utilice para "derrotar la política pública, justificar la inequidad, proteger el fraude o defender el crimen", es un principio tan bien establecido que no requiere elaboración, opina el profesor Stevens (*Stevens on Corporations*, 2da. ed., 1949, pág. 95). El estudio que hemos hecho de los casos y los autores confirma tal aseveración. V. I. Oleck, *Modern Corporation Law*, 1958, págs. 25 y 28–72; *Ballantine on Corporations*, Rev. ed., 1946, págs. 292–293, 305–306, 329–332; *Lattin on Corporations*, 1959, págs. 66–68; Berle & Warren, *Business Organization (Corporations)*, 1948, págs. 155–156; I *Fletcher Cyclopedia of Corporations*, 1931, págs. 134–177; Reseña en 6 De Paul L. Rev. 244 (1957); Berle, *The Theory of Enterprise Entity*, 47 Colum. L. Rev. 343 (1947); Reseña, *Efficacy of the Corporate Entity in Evasion of Statutes*, 26 Iowa L. Rev. 350 (1941). La jurisprudencia en este sentido es abundante y sería ocioso copiarla aquí. Bástenos con mencionar algunos ejemplos representativos y para más casos nos remitimos a las extensas anotaciones que aparecen en las obras citadas.

En un caso parecido al de autos, *N.L.R.B.* v. *Deena Artware Inc.* 361 U.S. 398 (1960), en el sentido de que una junta administrativa se propuso investigar una organización corporativa para llegar a la realidad, el Tribunal Supremo de los Estados Unidos expresó, a la pág. 402, "[C]reemos que la Junta tiene derecho a demostrar que esas diversas corporaciones no son lo que aparentan ser, sino que en realidad sólo son divisiones o departamentos de una sola empresa", y a la pág. 403 se refirió al problema central "de si en realidad

se trata de una sola empresa, siendo las entidades corporativas mayormente arreglos en papel que no reflejan la realidad del negocio." Se sostuvo la facultad de la Junta de investigar.

█ Las entidades corporativas pueden descartarse cuando son instrumentos para evadir un claro propósito legislativo, *Schenley Distillers Corporation* v. *U.S.*, 326 U.S. 432, 437 (1946). En *Anderson* v. *Abbott*, 321 U.S. 349, 362–363 (1944) el Tribunal se expresó en forma terminante:

"Con frecuencia se ha sostenido que no se permitirá que la interpolación de una corporación derrote una política legislativa, no empece que ése sea el propósito o solamente el resultado del arreglo. *United States* v. *Lehigh Valley R. Co.*, 220 U.S. 257; *Chicago, M. & St. P. Ry. Co.* v. *Minneapolis Civic & Commerce Assn.*, 247 U.S. 490; *United States* v. *Reading Co.*, 253 U.S. 26. El Tribunal en *Chicago, M. & St. P. Ry. Co.* v. *Minneapolis Civic & Commerce Assn.*, supra, a la pág. 501, expresó que los tribunales no se dejarán cegar o engañar por meras formalidades y bregarán con la substancia de las cosas como si la ficción corporativa no existiese y según la justicia del caso amerite."

Los tribunales descorren el velo corporativo cuando la intención o el propósito de la estructura corporativa es evadir el cumplimiento de un estatuto. *Northern Securities Co.* v. *U.S.*, 193 U.S. 197 (1904); *Linn & Lane Lumber Company* v. *U.S.*, 236 U.S. 574 (1915); *Barbour* v. *Thomas*, 7 F.Supp. 21 (1933); *Metropolitan Holding Co.* v. *Snyder*, 79 F.2d 263 (1935).

Para otras expresiones judiciales sobre el particular pueden verse *U.S.* v. *Reading*, supra, pág. 63; *Taylor* v. *Standard Gas Co.*, 306 U.S. 307, 322 (1939); *U.S.* v. *Lehigh Valley R.R. Co.*, supra, pág. 259; *Day* v. *Shapiro*, 267 F.2d 669, 673 (1959); *Superior Portland Cement* v. *Pacific Coast Cement*, 205 P.2d 597, 620 (1949); *California Zinc Co.* v. *U.S.*, 72 F.Supp. 591, 593 (1947). En nuestra jurisdicción el principio también ha sido reconocido anteriormente, *J. E. Candal & Co.*

v. *Rivera*, 86 D.P.R. 508 (1962) ; *Sucn. Pérez* v. *Gual*, 76 D.P.R. 959, 963 (1954) ; *Cruz* v. *Ramírez*, 75 D.P.R. 947, 954 (1954). (5)

█ A la luz de la organización corporativa antes descrita, de la naturaleza de la operación del embarque del azúcar a granel y del derecho aplicable, concluimos que la Junta Azucarera estuvo justificada al descorrer el velo corporativo a los fines de desempeñar sus funciones en la administración de la Ley Azucarera. Si se permitiese que la operación del embarque de azúcar se fraccionase artificialmente mediante la interpolación de varias corporaciones hermanas, y que éstas hiciesen ganancias en dicha operación, se estaría

---

(5) En las modernas democracias industriales las corporaciones así como las uniones obreras, han emergido como organizaciones de fuerza extraordinaria. En algunos países, en algunas ocasiones, su fuerza ha sido tal que se ha producido lo que los observadores de este fenómeno social han llamado "gobierno por grupos privados" (51 Harv. L. Rev. 201; 13 La. L. Rev. 440). En Puerto Rico una conciencia social despierta nos ha librado hasta la fecha de este mal. En toda democracia ese peligro siempre existe en forma latente y para que no se materialice es necesario un entendimiento del problema por la ciudadanía y sus líderes. El estado democrático, y no los organismos privados, profesionales o comerciales, es a fin de cuentas el depositario del interés general y sólo a ese interés se debe.

En los Estados Unidos el rol de las grandes corporaciones, no siempre bueno ni siempre malo, ha sido objeto de la atención de eminentes abogados, economistas y sociólogos. Desde la Segunda Guerra Mundial para acá, por ejemplo, se han publicado interesantes análisis del problema, Drucker, *The Concept of the Corporation* (1946) ; Lilienthal, *Big Business* (1952) ; Galbraith, *American Capitalism* (1952) ; Berle, *The 20th Century Capitalistic Revolution* (1954) ; Latham, 47 Am. Econ. Rev. págs. 303 *et seq.* (1957). Aunque estos autores, como es natural, hacen diversas evaluaciones, todos concuerdan en que las grandes organizaciones industriales y obreras han dejado de ser asuntos de interés meramente privado. Lo dejan de ser en la medida en que adquieren poder sobre el cuerpo social en general. Cada vez con más frecuencia los parlamentos, los tribunales y los juristas se encontrarán con el problema de crear las ecuaciones jurídicas capaces de mantener el balance social entre esas fuerzas que es necesario conservar si la forma democrática de vida ha de subsistir. Es bueno que estemos conscientes de esa tarea. V. Friedmann, *Corporate Power, Government by Private Groups, and the Law,* 57 Colum. L. Rev. 155 (1957) y Friedmann, *Law in a Changing Society,* London, Stevens & Sons Ltd., 1959, págs. 288–320.

evadiendo el claro mandato del Art. 8 antes citado de la Ley Azucarera, 5 L.P.R.A. sec. 377, y se estaría frustrando la política pública contenida en dicha Ley de garantizar a los colonos un trato justo en sus relaciones con los molinos. *Central Monserrate, Inc.* v. *Junta Azucarera,* 83 D.P.R. 109 (1961) pág. 114; *Roig* v. *Sugar Board,* 235 F.2d 347, 351–352 (1956); cert. denegado, 352 U.S. 928 (1956). Las ganancias que harían las corporaciones hermanas en el proceso de embarque encontrarían eventualmente el camino hacia la corporación matriz en New Jersey, poseída por las mismas personas que poseen la Central Guánica y a la vez disminuirían el precio que han de recibir los agricultores de caña por sus azúcares. Como dijimos en *South P.R. Sugar Co.* v. *Junta,* 82 D.P.R. 470, 477 (1961), "es obvio que ni la Junta Azucarera ni este Tribunal pueden permitir que por medio de una ficción legal, no importa lo hábil e ingeniosa que parezca a primera vista, se destruyan los derechos que la ley otorga a los colonos y los principios de trato equitativo que deben regir las relaciones entre las partes."

■ Por lo antes expresado somos de opinión que los errores 1 al 4 no se cometieron. Tampoco se cometió el quinto error señalado. La Junta asumió jurisdicción sobre un asunto sobre el cual tiene perfecto derecho en ley para hacerlo: investigar la veracidad y razonabilidad de los descuentos que por concepto de gastos de embarque y mercadeo la peticionaria ha hecho a los colonos, 5 L.P.R.A. secs. 377 y 392; *Central Monserrate* v. *Junta,* supra, pág. 114.

*Las resoluciones y órdenes de la Junta Azucarera dictadas en este caso en 8 de mayo de 1961 y 12 de junio de 1961, serán confirmadas.*