# 2008 DTA 121

**TRIBUNAL DE APELACIONES
REGIÓN JUDICIAL DE CAGUAS
PANEL XI**

IVETTE CRUZ RODRÍGUEZ
Apelada

v.

PRIME FOOD SERVICES, ANGEL AYALA, Y SU ESPOSA JACQUELINE DELGADO, AMBOS POR SÍ Y EN REPRESENTACIÓN DE LA SOCIEDAD LEGAL GANANCIALES COMPUESTA POR AMBOS
Apelantes

Núm. KLAN-07-00588

San Juan, Puerto Rico, a 17 de octubre de 2008

Panel integrado por su Presidenta, la Juez Pesante Martínez, el Juez Escribano Medina y la Juez Pabón Charneco

Pesante Martínez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Comparecen ante nos, Prime Food Services, Inc., el Sr. Ángel Ayala, Jackeline Delgado y la sociedad legal de bienes gananciales (apelantes). Solicitan que revisemos una Sentencia de 23 de marzo de 2007, notificada el 4 de abril de 2007, que dictó el Hon. José Alberto Ramos Aponte, Juez del Tribunal de Primera Instancia, Sala de Caguas (TPI). Mediante el referido dictamen, el TPI declaró con lugar la querella que presentó Ivette Cruz Rodríguez (apelada) al amparo de la Ley del Sistema de Compensaciones por Accidentes del Trabajo, Ley Núm. 45 del 18 de abril de 1935 (Ley del Fondo).

En su dictamen, el TPI destacó en resumen que la controversia giró en torno a la alegación de la apelada de que trabajaba para los apelantes y que sufrió de una condición que estuvo relacionada al trabajo. Según adujo, se reportó al Fondo del Seguro del Estado (el Fondo) y recibió tratamiento. Tras haber sido dada de alta, pidió la reinstalación a su empleo. Indicó que sus patronos, los apelantes, se negaron a reinstalarla. Entonces, al amparo de la Ley del Fondo, la apelante solicitó como remedio la reinstalación a su empleo, los salarios dejados de percibir y una indemnización por daños y perjuicios (angustias mentales). El TPI le concedió el remedio solicitado.

Inconformes con el dictamen, los apelantes acudieron ante nos y señalaron que erró el TPI: (1) al imponerle responsabilidad al apelante Ángel Ayala, pues el emplazamiento que se le había diligenciado fue anulado mediante Resolución y no volvió a ser emplazado; (2) al haber descorrido el velo corporativo de la apelante Prime

Food, Inc., para imputarle responsabilidad a la apelante Jackeline Delgado; (3) al negarse a admitir una declaración jurada de uno de los testigos, aun cuando tal declaración se ofreció bajo la Regla 63 de las de Evidencia; (4) al negarse a admitir unos documentos relacionados a las finanzas de Prime Food, Inc., los cuales se ofrecieron finalmente al amparo de la Regla 65(F) de las Reglas de Evidencia; (5) al valorar los daños emocionales de la apelada en $30,000; (6) al haber ordenado el pago de salarios dejados de devengar, computándolos entre el 11 de octubre de 1999 y enero de 2004, esto, aun cuando el negocio en el que trabajó la apelada dejó de operar en el 2001; (7) al determinar que el despido de la apelada se debió a la negativa de Prime Food Services, Inc. a reinstalarla por aquélla haberse acogido a los beneficios de la Ley del Fondo, y no por el fundamento que adujeron, esto es, la mala administración de la apelada mientras fungió como gerente en uno de los establecimientos de los apelantes; y (8) por haber hecho una apreciación irrazonable y parcializada de la prueba.

Tuvimos la oportunidad de examinar los argumentos de las partes y la transcripción de la prueba oral. Advertimos, de entrada, que modificamos el dictamen apelado.

# I

Esbozamos a continuación una breve relación de los hechos e incidentes procesales más relevantes de este caso.

Ángel Ayala y Jackeline Delgado son los accionistas de Prime Food Services, Inc. (Prime). Esta compañía se dedica a la administración de cafeterías, por ejemplo, en farmacéuticas u otras empresas. En diciembre de 1997, Prime contrató con la farmacéutica Bristol Myers Squibb (Bristol), para administrar varias cafeterías ubicadas en distintas plantas de la referida farmacéutica. El contrato se extendía por 3 años. Cuando entró a administrar, Prime entrevistó a los empleados que ya trabajaban en las cafeterías. A algunos, los contrató para que siguieran trabajando bajo su administración. Así sucedió con la apelada, quien ya llevaba unos 10 años trabajando como cocinera en la cafetería de la planta de Humacao de la Bristol. [1]

En enero de 1999, Prime nombró a la apelada como gerente de la cafetería. Como parte de sus funciones, la apelada tendría que supervisar al personal de la cafetería, hacer inventarios a final de mes, entregar las cajas con el *"petty cash"* a las cajeras y hacer el cuadre de caja por las tardes. También tenía que recopilar, guardar y entregar los recibos de compra y de ventas, y además, recibir la mercancía que traían los suplidores. En cuanto a la compra de mercancía -aparte de los que traían los suplidores-, el hermano de Ángel Ayala se encargaba normalmente de adquirirlos. A veces, la apelada también se encargaba de hacer las compras.

Nunca se le amonestó a la apelante por los inventarios que realizó. En cuanto a las facturas de compra, al menos en dos ocasiones se le cuestionó que eran muy altas. La apelada destacó que las facturas eran de compras que no hizo ella. Añadió que incluía la compra de bebidas alcohólicas, aun cuando en la farmacéutica no se vendía este tipo de bebidas.

Según declaró Ángel Ayala, en el 1998, la cafetería de Humacao comenzó a tener pérdidas. Alegadamente, se reunía periódicamente con la apelada para discutir el asunto de las pérdidas y lo que estaba sucediendo con la administración de la cafetería. En diciembre de 1998, según declaró, la cafetería tuvo unas ganancias muy reducidas.

De acuerdo a lo declarado en juicio, así continuó la situación hasta que en abril de 1998, Ángel Ayala decidió asumir personalmente la administración de la cafetería. Instruyó a la apelada a que se fuera de vacaciones durante mayo. Su intención era hacer una auditoría para examinar qué factores provocaban las pérdidas, y además, precisar si las pérdidas estaban relacionadas al desempeño de la apelada. [2] Ángel Ayala declaró durante el juicio que le informó a la apelada que si el negocio tenía ganancias durante su ausencia, su empleo estaría en peligro. Posteriormente, comentó aquél, que las ventas aumentaron en ese mes de mayo de 1998.

Por otro lado, agregó que algo inesperado sucedió ese mes. Adujo que recibió una carta de parte de un bufete de abogados que representaban a la apelada. Se le advirtió que se presentaría en su contra una demanda por no pagar seguro social à su empleada, y además, por no concederle el período para ingerir alimentos.

A finales de mayo de 1998, Ángel Ayala llamó a la apelada para que se reintegrara a sus labores. Así lo hizo aquélla el 30 de mayo de 1998. Para cumplir con sus labores, la apelada fue a entregar las cajas (con el *petty cash*) a las cajeras. Entonces, el yerno de Ángel Ayala, le indicó que desde ese momento no podría tener más a su cargo el manejo de dinero o supervisión de empleados. Tendría que comenzar a trabajar en la cocina. Ángel Ayala no desautorizó la orden que dio su yerno. Alegadamente, ya a esta fecha tenía decidido despedir a la apelada. Adujo, no obstante, que cuando regresó la apelada, le indicaron que trabajara en la cocina porque su regreso al trabajo alegadamente coincidió con la ausencia del cocinero de la cafetería.

La primera semana de junio, la apelada tuvo que trabajar en la cocina. Durante esa semana, se sintió presionada por Ángel Ayala y su yerno. Éstos comenzaron a hacerle imputaciones de alegadas irregularidades en su desempeño. Particularmente, le cuestionaban por regalar comidas a los empleados de seguridad y de mantenimiento. La apelada se sintió presionada y afectada emocionalmente. El lunes 10 de mayo de 1999, la apelada no fue a trabajar. Al siguiente día, 11 de junio de 1999, se reportó al Fondo. La apelada visitó al menos en 5 ocasiones a un médico siquiatra del Fondo.

En el Fondo, se evaluó a la apelada y se le diagnosticó un esguince agudo cérvico dorsal y en los hombros. Se determinó que el padecimiento estaba relacionado al trabajo. Se recomendó tratamiento en descanso. El 8 de octubre de 1999, evaluaron a la apelada en el Fondo. Se le dio de alta y se dispuso que podía ser reinstalada a su empleo, pero con el derecho a continuar recibiendo tratamiento mientras trabajaba.

El mismo día, la apelada le llevó a Ángel Ayala el documento del alta que emitió el Fondo. En reacción, este último dictó a su secretaria una carta dirigida a la apelada. La carta no fue de despido. Más bien, expresó que se negaba a reinstalar a la apelada hasta que el Fondo le enviara los documentos que acreditaran el seguimiento del caso de la apelada. Se le entregó la carta a la apelada. Aunque la apelada comentó la situación en el Fondo, no se le proveyó documentación adicional para entregarle a su patrono.

Posteriormente, Ángel Ayala citó a la apelada. La reunión se llevó a cabo el 19 de octubre de 1999. Le entregó a la apelada un documento en el que indicaba que estaba renunciando a su empleo. La apelada se negó a firmar el documento, y seguido, Ángel Ayala le indicó que estaba despedida. Ante esta situación, la apelada le pidió que pusiera por escrito su decisión de despedirla y las razones para ello. Ángel Ayala le contestó que se lo pidiera mediante su abogado. Posteriormente, la apelada le envió una carta resumiendo el suceso y pidiéndole a Ángel Ayala que le proveyera el nombre y dirección de su abogado. No recibió contestación a su carta.

Después, y por estos hechos, la apelada presentó una querella contra Prime, Ángel Ayala y Jackeline Delgado. Al amparo del Artículo 5-A de la Ley del Fondo, 11 L.P.R.A. §7, la apelada cuestionó la negativa de los apelantes a reinstalarla en su empleo; por ello, solicitó los remedios que dicho artículo concede. En cuanto a los aspectos procesales del caso, hay que destacar que, mediante Resolución de 8 de diciembre de 2003, el TPI determinó que el emplazamiento que se le diligenció a Ángel Ayala fue defectuoso, y que por ello, el tribunal carecía de jurisdicción sobre su persona. Se proveyó para que la apelada diligenciara un nuevo emplazamiento. No obstante, en el expediente del caso no hay prueba que acredite que se hubiera cumplido con el diligenciamiento de un nuevo emplazamiento a Ángel Ayala. También hay que tomar en cuenta que en el informe de conferencia con antelación al juicio, y luego durante el juicio, quedó estipulado que Ángel Ayala, Jackeline Delgado y la sociedad legal de bienes gananciales compuesta por ambos, son los dueños o accionistas principales de Prime Food Services, Inc.

En cuanto a la prueba testifical vertida en el juicio, merece destacar lo siguiente. Como parte de su testimonio,

la apelada indicó que después de su despido, se sintió sumamente mal y deprimida. Visitó en 3 ó 4 ocasiones un médico de familia. [3] Según indicó, el médico de familia la ayudó emocionalmente. Declaró que en el Fondo recibió tratamiento de un siquiatra. Recibió unas 5 terapias para atender su condición emocional. Ahora bien, también indicó que después de ese tratamiento, nunca más recibió tratamiento siquiátrico. [4] También, ésta declaró que desde que comenzó a trabajar para los apelantes hasta que se le despidió, ganaba $300 semanales y no tenía plan médico. [5]

Por otro lado, en cuanto a la prueba de los apelantes, se suscitó lo siguiente durante el juicio. Se ofreció el testimonio de Aileen Nieves García. Ésta laboró bajo la supervisión de la apelada. El interrogatorio directo se redujo a unas cuantas preguntas que fueron objetadas oportunamente por el representante legal de la apelada. El TPI declaró con lugar todas las objeciones, ya que las preguntas eran sugestivas. Para efectos prácticos, no surgieron para el registro las contestaciones al interrogatorio directo. Después, uno de los representantes legales de los apelantes solicitó que se admitiera en evidencia una declaración jurada que había hecho la testigo. La declaración jurada es del 22 de febrero de 2002.

Se desarrolló para récord toda una discusión en cuanto a la admisibilidad de esa declaración jurada. Básicamente, el argumento del representante legal de los apelantes fue que por la Regla 63 de Evidencia, para que pudiera admitirse su declaración anterior como prueba sustantiva, bastaba con haber producido en corte a la testigo y con ponerla a la disposición de las demás partes para ser contrainterrogada.

El TPI se negó a admitir la declaración jurada como evidencia. Destacó que lo que se pretendía era meramente hacer unas preguntas para que la testigo autenticara el documento, y que finalmente, el contenido del escrito sustituyera lo que debió o pudo haber declarado en el interrogatorio directo. [6] Sólo aceptó que se presentara la declaración jurada en cuestión como prueba ofrecida y no admitida. [7]

De manera similar, aunque por fundamentos distintos, el TPI se negó a admitir en evidencia unos informes o estados financieros que pretendían presentar los apelantes como prueba. Los informes se ofrecieron mientras declaraba el apelante Ángel Ayala. Alegadamente, los informes demostrarían que la cafetería tuvo pérdidas cuando la apelada la administraba. Se adujo que surgía de los documentos que en los meses en que no estuvo la apelada, la cafetería tuvo ganancias. La representación legal de los apelantes indicó que la prueba debía admitirse por lo dispuesto en la Regla 65 (F) de Evidencia (sobre excepción a la regla general de exclusión de prueba de referencia; admisibilidad de record de negocios). El TPI se negó a admitir los referidos informes financieros. [8]

En la discusión, prevaleció el argumento del representante legal de la apelada. Éste planteó que el problema con los referidos documentos no era conque Ángel Ayala los pudiera identificar como documentos o récord de su negocio. No obstante, indicó que había problema con la autenticación de esos documentos. Se destacó que, según lo que logró declarar Ángel Ayala, los documentos los preparó su contable, quien, al momento del juicio, se expresó que había muerto. Se cuestionó que los informes no contaran con la firma del profesional que los preparó, ni se marcó con el sello que hubiera correspondido de haber sido el contable un contador público autorizado (C.P.A.). Expresó que Ángel Ayala no podía demostrar si se cumplió con los estándares que exige la profesión para preparar esos documentos. Más aún, llamó la atención al hecho de que los referidos informes alegadamente se basaban en facturas e inventarios, que a fin de cuentas, ni siquiera se adjuntaron como anejos. [9]

Entre otros asuntos, Ángel Ayala declaró, primero, que despidió a la apelada porque entendía que el trabajo que ella hizo fue deficiente. Indicó que la apelada puso en peligro el contrato que tenía con la farmacéutica, el cual vencía en diciembre de 2001. [10] Ahora bien, posteriormente indicó que fue en el 2004 cuando perdió el contrato de las cafeterías con la Bristol. [11]

Ángel Ayala testificó que tanto él como el resto de los empleados conocían de ciertas irregularidades que cometía la apelada desde el 1998. Entonces, se le cuestionó porqué no la despidió tan pronto como regresó de recibir el tratamiento del Fondo, o incluso, porqué no la despidió en el 1998 cuando ya se comenzaban a registrar las pérdidas del negocio. Aquél indicó, en una ocasión, que tenía decidido despedirla incluso antes de mayo de 1999 (cuando le dio el mes de vacaciones); pero, en otra ocasión, dijo que lo decidió después de mayo, cuando observó, alegadamente, que con la ausencia de la apelada en mayo, el negocio generó ganancias. Adujo que no despidió a la apelada justo cuando regresó de las vacaciones porque su regreso al trabajo "*coincidió*" con la ausencia del cocinero de la cafetería.

Se le confrontó también con el hecho de que no detalló las alegadas irregularidades en las que incurría la apelada cuando se le preguntó sobre el particular en los interrogatorios que se le cursaron durante el descubrimiento de prueba. Indicó Ángel Ayala que pensaba probar tales irregularidades con los informes financieros.

Posteriormente, se le continuó interrogando sobre lo que motivó el despido de la apelada. Contestó que la determinación de despedirla fue por ella haberse reportado al Fondo sin que hubiera sufrido un accidente laboral. También indicó que se vio motivado a despedirla, ya que cuando la apelada se fue de vacaciones (en mayo de 1999), recibió una carta de un bufete que la representaba, en la cual se le advirtió que se presentaría demanda si no le pagaba horas extras trabajadas y adeudadas, y además, por no concederle horario para ingerir alimentos. De hecho, indicó que el mismo abogado que representaba a la apelada en el juicio, figuraba como uno de los abogados del bufete que le envió la carta. **[12]** A preguntas posteriores, modificó su argumento indicando que, más bien, esas situaciones "*coincidieron*" con las conversaciones que tuvo en abril de 1999 con la apelada, esto es, con "*las medidas que se iban a tomar*" con ella. Adujo, entonces, que las referidas situaciones no fueron "*necesariamente*" lo que lo motivó a despedir a la apelada, pero que sí fue parte de lo que consideró para tomar la decisión. **[13]**

Llegamos a las siguientes conclusiones tomando en cuenta los hechos relatados y el derecho aplicable.

## II

### A

En este caso, no se cometieron los primeros dos errores señalados. El TPI aplicó correctamente la doctrina de descorrer o desgarrar el velo corporativo, y además, al hacer una determinación de responsabilidad civil contra Ángel Ayala.

Primero, advertimos que en una ocasión anterior, en el caso KLCE-2002-00257, mediante Resolución de 27 de marzo de 2002, indicamos lo siguiente en respuesta al recurso de *certiorari* que presentó Jackeline Delgado. Advertimos en ese dictamen que la referida apelante presentó una moción para que se desestimara la querella en su contra, en su carácter personal, o que se dictara sentencia sumaria a su favor porque la apelada alegadamente no detalló en la querella que la corporación (Prime Food Services, Inc.) fuera su *alter ego*. El TPI resolvió que existía controversia en relación a si Jackeline Delgado debía responder de manera personal por los daños reclamados por la apelada, y además, a si Prime era en realidad un *alter ego* de sus accionistas (Ángel Ayala y Jackeline Delgado). Así, pues, se denegó la solicitud de sentencia sumaria. Estuvimos conformes con tal dictamen.

Explicamos en esa ocasión que una corporación tiene su propia personalidad jurídica y su propio patrimonio, distinto a la personalidad y al patrimonio de sus accionistas, sean estos últimos personas naturales o jurídicas. *D.A.C.O. v. Alturas Fl. Dev. Corp. y otro*, 132 D.P.R. 905, 924 (1993). Aclaramos que si la corporación es un *alter ego* o conducto o instrumento económico pasivo de sus únicos accionistas, recibiendo éstos exclusiva y personalmente los beneficios producidos por la gestión corporativa, entonces los accionistas

serían individualmente responsables si ello es necesario para evitar un fraude o la realización de un propósito ilegal o para evitar una clara inequidad o mal. *Cruz v. Ramírez*, 75 D.P.R. 947, 954 (1954). También comentamos que para prescindir de la ficción corporativa, y así descorrer el velo corporativo, hay que tomar en cuenta los hechos específicos de cada caso, a la luz de los principios de derecho aplicables, y ello debe ser resuelto por el tribunal de primera instancia al considerar la prueba. *Id.* Agregamos que, al examinar la prueba, el tribunal deberá observar la naturaleza de las transacciones corporativas para así no dejarse engañar por las formalidades de las mismas. *South P.R. Sugar Corp. v. Junta Azucarera*, 88 D.P.R. 43, 57 (1963).

Como indicamos en ese dictamen, se han establecido una serie de factores que los tribunales deben considerar para así poder determinar si procede o no descorrer el velo corporativo. Entre los factores a ponderar se encuentran: (1) el control del accionista sobre los asuntos corporativos; (2) el trato sobre los activos de la corporación como activos personales; (3) el retiro irrestricto del capital corporativo; (4) la mezcla de activos personales con activos corporativos; (5) la estructura de capital inadecuada de la corporación; (6) la falta de récords corporativos; (7) la inobservancia de formalidades corporativas; (8) la inactividad de los demás oficiales y directores; (9) la práctica de no declarar dividendos; (10) la presentación pública del accionista como personalmente responsable por las obligaciones de la corporación; y (11) el manejo de la corporación sin atención a su personalidad independiente. *D.A.C.O. v. Alturas Fl. Dev. Corp. y otro, supra*, pág. 928, n. 3.

Corresponde a la parte que propone el levantamiento del velo presentar prueba que demuestre que no existe una separación adecuada entre la corporación y el accionista, y que los hechos son tales que reconocer dicha persona jurídica equivaldría a sancionar un fraude, promover una injusticia, evadir una obligación estatutaria, derrotar la política pública, justificar la inequidad, proteger el fraude o defender el crimen. *Srio. D.A.C.O. v. Comunidad San José, Inc.*, 130 D.P.R. 782, 798 (1992). El peso de la prueba no se descarga con la mera alegación de que la empresa es un *alter ego* de una persona, sino con prueba concreta que demuestre que la personalidad de la corporación y la del accionista no se mantuvieron adecuadamente separadas. *D.A.C.O. v. Alturas Fl. Dev. Corp. y otro, supra*, pág. 927. La prueba que se presente a tales efectos deberá ser robusta y convincente. *González v. San Just Corp.*, 101 D.P.R. 168, 172 (1972).

En este caso, hubo tanto prueba documental como testifical que justificó descorrer el velo corporativo respecto a Prime. Como parte de los hechos discutidos, el TPI pudo observar que se dieron transacciones o actuaciones que no denotaban una separación adecuada entre un acto corporativo y un acto personal de un accionista. Surge de la prueba que Ángel Ayala, uno de los dos accionistas principales de Prime, tomó la determinación de reubicar de posición a la apelada (de gerente a cocinera), negarse a reinstalarla, y finalmente, despedirla, sin que mediaran resoluciones corporativas a esos efectos. También, pareció delegarse facultades decisionales, o para realizar compras y otras transacciones, a familiares de los accionistas sin que se justificara que aquéllos fueran, al menos, funcionarios de la corporación. Más aún, a pesar de que alegadamente desde el 1998 se fueron percatando de irregularidades por parte de la apelada, no se acreditó que existiera un récord de amonestaciones o de las alegadas reuniones mensuales o que se llevaban a cabo cada vez que se registraban las pérdidas en la cafetería.

Todo lo anterior denota falta, o incluso, inexistencia de récords corporativos. También, esto denota inobservancia de formalidades corporativas. Agréguese que quedó evidenciado, para efectos prácticos, el control exclusivo de Ángel Ayala de las operaciones de Prime. Estos factores permiten y justifican que se descorriera el velo corporativo para así evitar una posible injusticia. Descorrido el velo corporativo, se podía llegar hasta los accionistas de Prime para que respondieran personalmente por las actuaciones que provocaran daño a su empleada, la apelada.

En este caso, como bien estipularon las partes, los accionistas y dueños de la corporación Prime, eran Ángel Ayala y Jackeline Delgado. A éstos, se les reclamó responsabilidad en su capacidad personal, como accionistas de Prime. Ahora bien, como estaban casados, también se les reclamó a la sociedad legal de bienes gananciales

que componen ambos.

En cuanto a Ángel Ayala, en efecto, el TPI se declaró sin jurisdicción sobre su persona por defectos en el emplazamiento. No se acreditó que se le hubiera diligenciado un nuevo emplazamiento. Por tanto, el TPI nunca adquirió jurisdicción sobre su persona. Así, pues, el dictamen que emitió el TPI, esto es, la determinación de responsabilidad civil por actuaciones suyas, más la concesión de los remedios, en principio, no es exigible respecto a aquél.

Ahora bien, la determinación de responsabilidad civil que hizo el TPI fue basada en solidaridad. Este caso conforma un supuesto de solidaridad pasiva, esto es, que existe una pluralidad de deudores. Son cocausantes de daño y codeudores solidarios Ángel Ayala y Jackeline Delgado, tanto como accionistas de Prime, como por ser miembros de la sociedad legal de bienes gananciales que se beneficiaba de las transacciones de Prime.

En el caso de Jackeline Delgado, la deuda descrita en el dictamen le es exigible como accionista que derivaba beneficios de las operaciones de Prime, y además, como miembro de la sociedad legal de bienes gananciales que compone con Ángel Ayala. Por otro lado, las obligaciones y deudas que el dictamen apelado detalla, no son exigibles respecto a Ángel Ayala como accionista de Prime, ya que no se tuvo jurisdicción sobre su persona (en su capacidad de accionista de Prime). No obstante, Ángel Ayala sí está sujeto a responder, digamos, indirectamente, por ser miembro de la sociedad legal de bienes gananciales que compone con Jackeline Delgado.

En resumen, a Ángel Ayala sí se le podía imponer responsabilidad civil por sus actuaciones culposas. Ahora bien, en su relación de codeudor solidario respecto a la apelada, podrá responder por la deuda detallada en el dictamen apelado, no en su capacidad de accionista de Prime, pero sí, como miembro de la sociedad legal de bienes gananciales que compone con Jackeline Delgado. Valga aclarar que lo anterior, en nada menoscaba el derecho de la apelada a exigir, exclusivamente a Jackeline Delgado, la satisfacción total de los derechos establecidos por el TPI. Por existir pluralidad de deudores en este caso, la apelada, como único acreedor, tiene derecho a exigir, a cualquiera de los deudores, el pago íntegro de la obligación. *Arroyo v. Hospital La Concepción*, 130 D.P.R. 596 (1992); *Ramos v. Caparra Dairy, Inc.*, 116 D.P.R. 60 (1985).

**B**

No se cometió el tercer error señalado. Actuó correctamente el TPI al negarse a admitir como evidencia la declaración jurada de la testigo Aileen Nieves García. En este caso no se satisfacen los supuestos de la Regla 63 de Evidencia.

Como indicamos antes, para el récord, prácticamente no se registraron contestaciones de la referida testigo de los apelantes durante el interrogatorio directo. El TPI acogió, a nuestro juicio correctamente, las objeciones que levantó el representante legal de la apelada a las preguntas que se le hicieron a la testigo en el interrogatorio directo. Por otro lado, desconocemos si por frustración, o como estrategia, el representante legal de los apelantes que realizaba el interrogatorio directo, se movió entonces a presentar en evidencia la declaración jurada en controversia. El argumento del representante legal de los apelantes fue que por la Regla 63 de Evidencia, bastaba con haber producido en corte a la testigo, y además, con ponerla a la disposición de las demás partes para ser contrainterrogada, para que pudiera admitirse su declaración anterior como prueba sustantiva. El TPI, luego de una extensa y bien fundamentada discusión, decidió no admitir la declaración jurada ofrecida como prueba. Avalamos su determinación.

La Regla 63 de las Reglas de Evidencia, 32 L.P.R.A. Ap. IV, R. 63, dispone que es admisible, como excepción a la regla general de exclusión de prueba de referencia, una declaración anterior de un testigo que está presente en el juicio o vista y sujeto a ser contrainterrogado en cuanto a la declaración anterior, siempre que dicha declaración fuere admisible de ser hecha por el declarante declarando como testigo.

En relación a la interpretación de esta regla, se ha comentado que es tan amplia que podría entenderse que el testigo no tiene que dar testimonio alguno en corte, sino que se sienta en la silla de los testigos, se ofrece la declaración anterior bajo la Regla 63 y se pone al testigo a disposición de las demás partes para el contrainterrogatorio. Se ha indicado que podría malentenderse que, como la admisibilidad de la declaración anterior no depende de que sea o no incompatible con el testimonio en corte, no será necesario dar testimonio alguno en corte en el examen directo. Esta situación propiciaría que los casos se preparen en la oficina del abogado o del fiscal. E. L. Chiesa, *Práctica Procesal Puertorriqueña, Evidencia*, Tomo II, pág. 695.

Por tanto, para limitar el alcance de esta regla, se estableció que la Regla 63 sólo aplica cuando el declarante está ocupando la silla testifical, durante, o luego de haberse cubierto su testimonio directo y estando sujeto a contrainterrogatorio. *Id.*; citando a *Pueblo v. Esteves Rosado*, 110 D.P.R. 334, 338 (1980). Con esto se evita que se llame a un testigo sólo para ponerlo a disposición de contrainterrogatorio por la parte adversa y presentar como prueba sustantiva cuanta declaración haya prestado el testigo fuera de corte, oral o escrita, con o sin juramento. El testigo tiene que ofrecer algún testimonio en examen directo, lo que constituye un freno para el juicio por affidávit, que es lo que en gran medida se quiere evitar con la regla de exclusión general de prueba de referencia. E. L. Chiesa*, op. Cit.*, páginas 695-696.

Tomando en cuenta estos principios, destacamos lo siguiente. Para efectos prácticos, en este caso no se sentó a la testigo Aileen Nieves García con el objeto de completar un interrogatorio directo. Nos parece que se pretendió sustituir el testimonio que hubiera podido vertir en corte abierta con aquél que incluyó en su declaración jurada. Se pretendió acudir al supuesto excepcional de la Regla 63 de Evidencia con meramente aducir que se produjo a la testigo en corte y que estaba dispuesta a ser contrainterrogada por la parte adversa. De haberse permitido esto, se hubiera mal utilizado el mecanismo que provee la referida regla evidenciaria. El proceso se hubiera convertido en un juicio por *affidávit*.

Además, destacamos que el TPI agregó que de lo que logró declarar aquélla, y que pudo consignarse para récord, no le mereció credibilidad. En relación al valor probatorio de la declaración jurada, de haber sido admitida, y tomando en cuenta algunas declaraciones de la testigo, nos llamó la atención lo siguiente. Tal declaración jurada fue preparada en el 2002, esto es, más de dos años después del despido de la apelada, y entonces, unos 2 a 4 años después de suscitados los hechos o alegadas irregularidades de aquélla, las cuales comenzaron a registrarse desde el 1998 según se alegó. La declaración jurada se preparó en la oficina de Ángel Ayala, y la apelada fue instruida por los abogados de éste para ir a juramentarla al tribunal. Las alegadas irregularidades que la testigo en su declaración jurada imputó a la apelada, no se las contó a su patrono Ángel Ayala, *"totalmente"* o *"exactamente como fueron"*, sino hasta el día en que fue a su oficina a hacer la declaración jurada, y ello, después del despido de la apelada. Además, la referida testigo reconoció que prestó esa declaración jurada para ayudar a Ángel Ayala. **[14]**

Por todo lo anterior, reiteramos que, en este caso, no se cumplieron con los requisitos que establece la jurisprudencia interpretativa y que permiten la aplicación de la excepción a la regla general de exclusión de prueba de referencia que provee la Regla 63 de Evidencia. No se cometió el error señalado a estos efectos.

## C

Tampoco erró el TPI al negarse a admitir como evidencia de los apelantes unos alegados informes financieros de Prime. En este caso, distinto a como alegaron los apelantes, no se cumple con los requisitos que se exigen para la aplicación de la Regla 65(F) de Evidencia.

Como indicamos antes, los referidos informes demostrarían que la cafetería tuvo pérdidas cuando la apelada la administraba, y por otro lado, que en los meses en que no estuvo la apelada, la cafetería tuvo ganancias. El TPI se negó a admitir los referidos informes financieros bajo la excepción que provee la referida Regla 65(F) de Evidencia. Estamos conformes con su determinación.

Como excepción a la regla general de exclusión de prueba de referencia, bajo la Regla 65 (F) de Evidencia, 32 L.P.R.A. Ap. IV, R. 65 (F), son admisibles los récords de negocio. La referida regla dispone que:

*"Un escrito hecho como récord de un acto, condición o evento si el escrito fue hecho durante el curso regular de un negocio, en o próximo al momento del acto, condición o evento, y el custodio de dicho escrito u otro testigo declara sobre su identidad y el método de su preparación, siempre que las fuentes de información, método y momento de su preparación fueran tales que indiquen su confiabilidad. El término "negocio" incluye además de negocio propiamente, una actividad gubernamental, profesión, ocupación, vocación u operación de instituciones, ya sea con o sin fines pecuniarios."*

Para su aplicación, la regla exige que se cumplan cuatro requisitos: (1) que el escrito o récord haya sido hecho durante el curso regular del negocio; (2) que haya sido hecho en o próximo al momento del acto, condición o suceso al que hace referencia el récord; (3) que el custodio del escrito o récord, o algún otro testigo, declare sobre su identidad y método de preparación; y (4) que las fuentes de información, método y momento de la preparación del récord sean tales que indiquen su confiabilidad. *Hato Rey Stationery, Inc. v. E.L.A.*, 119 D. P.R. 129, 138 (1987).

De entrada, se ha destacado la importancia del tercer requisito, esto es, el testimonio del custodio, o *"algún otro testigo"*. Lo anterior, dado que tal testimonio es esencial para: determinar la confiabilidad del récord; cumplir con el requisito de autenticación que se exige como condición previa a la admisibilidad de la evidencia; y para demostrar que el escrito o récord refiere, en efecto, a una práctica de negocio continua y regular. *Id.*, pág. 139.

Antes de que pueda admitirse el alegado récord de negocio, como se hace con otros documentos, es necesario sentar las bases para su admisión. La Regla 65 (F) dispone la forma específica en que habrán de sentarse las bases. Refiriéndose al tercer requisito de la Regla 65(F), se ha establecido que se requiere el testimonio de un testigo **cualificado** que declare sobre los tres requisitos adicionales que la referida regla exige como condición previa a la admisibilidad del récord del negocio. *Id.*, páginas 139-140.

Sobre este particular se ha comentado que la regla categóricamente exige que el custodio del récord u otro **testigo competente** testifique sobre la identidad del récord y el método de su preparación. El objeto de esta exigencia es que se presente testimonio competente que permita al tribunal decidir si se satisfacen los requisitos establecidos por la regla. Lo importante, según se ha expresado, es que testifique alguien que conozca cómo se preparan los récords en el negocio, aunque él no haya preparado ni supervisado el récord en controversia. E. L. Chiesa, *op. Cit.,* páginas 813-815. Claro, lo anterior no menoscaba que se ha expresado que los propósitos, naturaleza, historia y ubicación de la Regla 65 (F) inclinan pesadamente la balanza a favor de requerir fielmente la presencia del custodio en el tribunal. *H.R. Stationary, Inc. v. E.L.A.*, *supra*, páginas 141-142.

Por otro lado, en relación al alcance del cuarto requisito para aplicar la Regla 65(F), se ha expresado que para determinar la confiabilidad de los récords ofrecidos en evidencia, hay que analizar: (1) si la información recopilada es importante para el negocio en cuestión fuera del contexto litigioso en el cual es ofrecida; (2) si el récord contiene información fáctica relativamente simple y no evaluaciones o conclusiones; (3) si la persona que transmite la información y la persona que practica el asiento (que pueden ser distintas) son independientes de las partes en el pleito; (4) si la información está corroborada por evidencia independiente; (5) si el registro lo prepara una persona con experiencia y si la exactitud del mismo fue verificada. *Hato Rey Stationery, Inc. v. E.L. A.*, *supra*, pág. 142.

Refiriéndose a la aplicabilidad de estos criterios, en *Hato Rey Stationery, Inc. v. E.L.A.*, *supra*, se determinó que los documentos ofrecidos como récord de negocio carecían de *"circunstancias de confiabilidad interna"*. En particular, se descartó la posibilidad de aceptar como prueba de que cierta transacción se llevó a cabo, las

facturas que se ofrecieron, ya que las mismas no tenían fecha. También se descartó otro récord que se ofreció en evidencia, ya que, aparte del referido documento, no se presentó documentación que corroborara las anotaciones consignadas en él. Se destacó, también, que no se ofreció información respecto a si el documento estaba o no preparado por una persona con experiencia o si se verificó la exactitud de la información contenida en el documento. Se tomó cuenta, además, de que debió recibirse prueba del custodio o cualquier otro testigo con conocimiento, de la forma y momento en que se preparó el documento.

Tomando en cuenta estos principios, concluimos lo siguiente. En este caso, los informes financieros que los apelantes ofrecieron como evidencia, pretendían probar la mala administración de la apelada. Los apelantes no cumplieron con producir a la persona que preparó los informes. Según se informó el mismo día de la vista, quien preparó los informes era un contable que había muerto. El testimonio de base que serviría para autenticar el documento, y luego, para respaldar como verdadero lo aseverado en los informes, sería el testimonio de Ángel Ayala.

La representación legal de la apelante, cuestionó la competencia y cualificaciones de Ángel Ayala para que vertiera el testimonio de base que serviría para la determinación de admisibilidad de tales informes. Éste no quedaba descalificado como testigo por el mero hecho de que no hubiera preparado los informes. Tal y como se adujo, Ángel Ayala tendría la competencia para identificar los documentos en cuestión. Ahora bien, quedaba en entredicho su competencia para ofrecer los detalles sobre el método de preparación de tales documentos. Tales funciones se le delegaron, según indicó, a un contable.

Entendemos que aparte del problema de la competencia del testigo que se presentó para poder autenticar el documento, también el documento carecía de *"circunstancias de confiabilidad interna"*. Se destacó que el documento no acreditaba la fecha de su preparación. Este hecho mina la confiabilidad del escrito, ya que a mayor tiempo transcurrido entre el suceso y la preparación del escrito, mayor probabilidad de inexactitud. *Hato Rey Stationery, Inc. v. E.L.A.*, *supra*, pág. 143. Lo anterior, de suyo, incide sobre los requisitos 2 y 4 que se exige para la aplicación de la Regla 65 (F).

Los documentos carecen de información que acrediten que la información consignada está corroborada por evidencia independiente. La ausencia de referencias relacionadas al método o estándares de contabilidad que se utilizaron para la preparación de esos informes, y sin que se produjera el testimonio del custodio o persona que los preparó o de un testigo con competencia, impedía determinar si se verificó la exactitud de los mismos con evidencia independiente. Sobre este asunto, particularmente se destacó que no se acompañó a los informes, prueba de las facturas o inventarios que alegadamente sirvieron de base para los cómputos.

Tampoco se produjo información que permitiera precisar si la persona que preparó los informes era una con experiencia. Finalmente, concluimos que no se probó adecuadamente que estos informes no fueran meramente unos récords preparados para fines de litigación. Siendo ello así, sostenemos la determinación de no admitir los referidos informes en evidencia, bajo la Regla 65(F) de Evidencia.

**D**

En cuanto a la valoración de los daños emocionales que alegadamente sufrió la apelada, estimamos que el remedio concedido fue excesivamente alto. Por tal razón, modificamos la determinación del TPI a estos efectos.

Tomamos cuenta de que los jueces del TPI están en mejor posición que los tribunales apelativos para hacer esa evaluación y valoración de daños. Son ellos los que tienen contacto directo con la prueba presentada en el proceso. Sobre este particular, aplica la norma de abstención judicial. Esto es, un tribunal apelativo no intervendrá con la estimación y valoración de daños que hagan los tribunales de instancia a menos que las cuantías sean ridículamente bajas o exageradamente altas. *Administrador F.S.E. v. ANR Construction Corp., et als*, res. el 23 de septiembre de 2004, **2004 JTS 162**. Cuando se da uno de esos casos excepcionales, los foros

apelativos pueden intervenir porque la norma de abstención no es absoluta. *Sanabria v. E.L.A.*, 132 D.P.R. 769, 772 (1993). Una parte que solicita la modificación de las sumas concedidas está obligada a demostrar la existencia de circunstancias que lo ameriten. *Nieves Cruz v. U.P.R.*, 151 D.P.R. 150, 176 (2000). De lo contrario, prevalece la norma de abstención en ausencia de pasión, prejuicio, error manifiesto o parcialidad.

En este caso, la prueba desfilada en cuanto a los alegados daños emocionales que sufrió la apelada se redujo a lo siguiente. Ésta declaró que tras su despido se sintió mal y deprimida. El único tratamiento especializado que recibió fue el del siquiatra que la evaluó y trató en unas 5 terapias. Lo anterior, cuando estuvo bajo tratamiento en el Fondo. Aparte de ese tratamiento siquiátrico, no recibió tratamiento adicional especializado para atender los alegados daños emocionales. Sólo agregó que visitó en varias ocasiones a un médico de familia, quien, alegadamente, la ayudó emocionalmente. No se presentó prueba respecto a la naturaleza y extensión del diagnóstico y tratamiento que el referido médico le brindó.

No obstante, le damos deferencia al TPI, quien tuvo ante sí a la apelada, escuchó su testimonio, pudo observar su *demeanor*, y en última instancia, le dio credibilidad a sus declaraciones sobre los daños que alegadamente experimentó. No obstante, por entender que la concesión de $30,000 por angustias mentales es un remedio excesivamente alto, reducimos esta partida a $12,000. Así modificado, se confirma la determinación del TPI sobre este particular.

**E**

En cuanto al sexto señalamiento de error, no se cometió. De la prueba testifical, surgió que la apelada, desde que comenzó a trabajar para los apelantes, lo que devengaba era un salario de $300 semanales. También quedó evidenciado con prueba documental que, aunque con el beneficio de poder seguir en tratamiento, la apelada debió ser reinstalada a su trabajo el 11 de octubre de 1999. A esos efectos, se presentó en evidencia los documentos que emitió el Fondo. No obstante, la reinstalación no se concretó. De hecho, más tarde en octubre, se despidió a la apelada.

Por otro lado, inicialmente se declaró que el contrato de administración de las cafetería entre Prime y la Bristol se extendería hasta el 2001. Pero Ángel Ayala declaró posteriormente que no fue sino hasta el 2004 que perdió el contrato de administración de las cafeterías de la Bristol.

Así pues, conviene destacar que el Artículo 5-A de la Ley del Fondo, en el cual se basó la querella de la apelada, provee como remedio al obrero a quien su patrono se niega a reinstalarlo, los salarios que hubiere devengado de haber sido reinstalado. Estimamos que para el cómputo de tal partida, el TPI bien podía tomar en cuenta el período que transcurrió entre la negativa a reinstalar a la apelada y el momento en que Prime cesó de operar en las cafeterías de la Bristol. Así lo hizo el TPI y estamos conformes con su determinación.

**F**

No se cometieron los errores séptimo ni octavo. El TPI bien pudo razonar que la negativa a reinstalar, y el eventual despido de la apelada, no estuvo relacionado a su alegada mala administración.

La prueba sobre la alegada mala administración de la apelada se circunscribiría al testimonio de Ángel Ayala, basándose en el contenido de los informes financieros de la cafetería, y además, en testimonio y declaración jurada de la testigo Aileen Nieves García. Sobre este asunto, hay que comentar que los informes financieros no fueron admitidos en evidencia correctamente. Tampoco surge prueba testifical que se ligue a lo que alegadamente demostraría el contenido de esta prueba documental.

En cuanto a la prueba testifical que sí se registró, por parte de Ángel Ayala, consta que aquél declaró que la determinación de despedir a la apelada fue por ella haberse reportado al Fondo sin que, alegadamente, hubiera sufrido un accidente laboral. Este hecho quedó claramente derrotado con la prueba documental emitida por el

Fondo, que sí hizo constar que la apelada desarrolló cierto padecimiento, y que el mismo estaba relacionado al trabajo. También indicó que se vio motivado a despedirla por la carta que recibió de los representantes legales de aquélla, en la que se le advertía de que se presentaría una demanda para reclamar pago de horas extras adeudadas, seguro social y horas de alimentos. Esta prueba, también hay que examinarla tomando en cuenta el hecho de que, aun cuando alegadamente las irregularidades de la apelada se registraron desde el 1998, y a pesar de las múltiples oportunidades que tuvo para ello, los apelantes no despidieron a la apelada sino hasta después de recibido el documento del Fondo en el que se ordenaba su reinstalación.

La otra prueba evidenciaria que hubiera permitido determinar que el despido estuvo ligado a la mala administración de la apelada, sería el testimonio de la testigo Aileen Nieves. Este testimonio, como explicamos antes, no fue admitido por razones justificadas. Por tanto, la prueba que tuvo ante sí el TPI, fue el testimonio de Ángel Ayala sobre las motivaciones que tuvo para despedir a la apelada, la negativa de reinstalar a aquélla en sus labores, a pesar de la determinación del Administrador del Fondo, y el eventual despido. No vemos en qué sentido pudo actuar con parcialidad el TPI con esta prueba. No se cometieron los errores señalados.

### III

En mérito de lo anterior, modificamos el dictamen apelado en cuanto a la partida concedida a la apelada por daños emocionales o angustias mentales. Como indicamos antes, reducimos el remedio a $12,000. Así modificado el dictamen, se confirma en todos sus extremos. Advertimos que esta modificación incide en el cómputo de los honorarios e intereses concedidos. Por tal razón, se devuelve el caso al TPI para que computen nuevamente estos conceptos.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. María E. Pérez Ortiz
Secretaria del Tribunal de Apelaciones

**ESCOLIOS 2008 DTA 121**

**1.** Sentencia, página 4 del Apéndice de la Apelación.

**2.** Transcripción de la Prueba Oral, Vista de 24 de agosto de 2007, declaraciones de Ángel Ayala, páginas 95-100.

**3.** Transcripción de la Prueba Oral, Vista de 15 septiembre de 2005, páginas 75, 80-81.

**4.** Transcripción de la Prueba Oral, Vista de 15 septiembre de 2005, páginas 113, 116, 126 y 132.

**5.** Transcripción de la Prueba Oral, Vista de 15 septiembre de 2005, pág. 42.

**6.** Transcripción de la Prueba Oral, Vista de 15 septiembre de 2005, páginas 194-195.

**7.** Destacamos que en el caso KLCE-05-01607, mediante Resolución de 15 de diciembre de 2005, los apelantes ya habían traído ante nuestra atención esta discrepancia en cuanto a la admisibilidad de la referida declaración jurada. No obstante, tomamos cuenta de que la determinación respecto a la no admisibilidad se dio mediante un dictamen interlocutorio. Por otra parte, también notamos que la apelada se había acogido al procedimiento sumario contemplado en la Ley Número 2 de 17 de octubre de 1961, según enmendada, 32 L.P.R.A. secs. 3118 y siguientes. Por tal razón, basándonos en la normativa aplicable, denegamos la expedición del auto de *certiorari* solicitado. Advertimos en esa ocasión que, en un caso en el que se invoca el referido procedimiento sumario bajo la Ley Núm. 2, la parte que pretenda impugnar una resolución interlocutoria, deberá esperar hasta que recaiga la sentencia final y sólo entonces, dentro del recurso de apelación, señalar el error cometido.

**8.** Transcripción de la Prueba Oral, Vista de 24 de agosto de 2006, páginas 55, 78-82.

**9.** Transcripción de la Prueba Oral, Vista de 24 de agosto de 2006, páginas 60-65.

**10.** Transcripción de la Prueba Oral, Vista de 24 de agosto de 2006, páginas 114-116.

**11.** Transcripción de la Prueba Oral, Vista de 24 de agosto de 2006, pág. 148.

**12.** Transcripción de la Prueba Oral, Vista de 24 de agosto de 2006, pág. 193.

**13.** Transcripción de la Prueba Oral, Vista de 24 de agosto de 2006, páginas 194-195.

**14.** Transcripción de la Prueba Oral, Vista de 15 septiembre de 2005, páginas 240, 243-244, 247, 249.